[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Grate*, Slip Opinion No. 2020-Ohio-5584.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5584

THE STATE OF OHIO, APPELLEE, *v.* GRATE, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Grate*, Slip Opinion No. 2020-Ohio-5584.]

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2018-0968—Submitted July 7, 2020—Decided December 10, 2020.)

APPEAL from the Court of Common Pleas of Ashland County,

No. 16-CRI-187.

_____

FRENCH, J.

## I. INTRODUCTION

{¶ 1} This is an appeal of right from two aggravated-murder convictions and death sentences. An Ashland County jury found appellant, Shawn Grate, guilty of the aggravated murder of E.G. and S.S. In total, Grate was convicted of 23 counts, including some related to a third victim, L.S., who survived. Both aggravated-murder counts included death-penalty specifications for a course of conduct involving multiple murders. The count charging Grate with E.G.'s murder also included an aggravated-murder-during-a-kidnapping death-penalty

specification.  The count charging Grate with S.S.'s murder also included a death-penalty specification for aggravated murder during a kidnapping, rape or aggravated robbery.  The jury recommended sentences of death, and the trial court sentenced Grate accordingly.

## II. TRIAL EVIDENCE

### A. Grate Moves to Ashland County

{¶ 2} Grate moved from Richland County to Ashland County in June 2016. He constructed a makeshift fort in a secluded area in some woods near Mifflin, a village within Ashland County.

{¶ 3} Around June 2016, Grate broke into two campers in nearby Charles Mill Park.  He stole a television, DVD player, chain saw, blankets, and food from one of the campers.  He then took some of this property to the other camper and stayed there while the owners were gone.

{¶ 4} In mid-July, Grate broke into the Mifflin Flea Market and stole food, money, Tasers, and other property.

{¶ 5} Around July 22, Grate broke into a vacant house at 363 Covert Court in Ashland.  The house had electricity but no water.  During a police interview with Grate after he had been arrested, Grate stated that "[t]he tv was there" and that he "went and bought a VCR * * * and a DVD player, kind of made [it] a home."  Grate worked for a short time at Save-a-Lot.

{¶ 6} During July and August 2016, Grate regularly had meals at the Salvation Army Kroc Center in Ashland.  He met L.S. there.  L.S. introduced Grate to E.G.  L.S. and E.G. lived in neighboring apartment buildings.

### B. E.G.'s Disappearance

{¶ 7} E.G. did not have a job; she lived alone and suffered from paranoid schizophrenia with mania.  Cindy Lynn Swanger, a peer-to-peer counselor, spoke to E.G. several times a week.  Swanger said that prior to August 16, E.G. was "pretty excited about something," and Swanger thought that E.G. had met someone.

E.G. called Swanger on August 16 and seemed anxious to talk, but they did not have an opportunity to speak in person.

{¶ 8} On August 16, E.G. went shopping in Ashland, and she was last observed walking along Main Street during the afternoon. Approximately two weeks after E.G.'s disappearance, she was reported missing.

### C. S.S.'s Disappearance

{¶ 9} On September 8, 2016, S.S. drove from her home in Greenwich, a village located in Huron County, to Ashland to shop. Around 8:30 p.m., S.S. stopped at a BP station in Ashland because of a flat tire. She called her son, who arranged for Wayne Bright, S.S.'s acquaintance, to change the tire.

{¶ 10} Grate and S.S. happened to meet at the BP station. Bright met them when he arrived. Around 10:00 p.m., Bright and Grate finished changing the tire, then Bright departed. S.S.'s son talked to her after the tire was changed, and S.S. told him that she was getting coffee and then would be going home. Nathaniel Keck, a BP employee, saw Grate and S.S. go to the register together where she bought Grate a cup of coffee. Keck said S.S. was "just chipper, in a good mood." Keck watched them leave the store together.

{¶ 11} When S.S. failed to return home, her family began searching for her. On September 11, family members were informed that her car had been found in a residential area in Ashland. S.S.'s cell phone was on the floorboard and her driver's license, which she normally kept in her wallet, was between the seats. And even though S.S. was short, the driver's seat was pushed all the way back.

{¶ 12} S.S.'s car was found parked in front of Joanna Smith's home. Smith remembered seeing it parked there in the evening sometime around September 11. She saw a man exit the vehicle and walk down the street. At trial, Smith identified Grate as the man she had seen.

*D. L.S.'s Abduction and Rape*

{¶ 13} During the summer of 2016, Grate and L.S. took long walks around Ashland a couple times a week, talking about the Bible and life. Grate wanted a romantic relationship with L.S., but she told him she was not interested in being more than friends.

{¶ 14} On September 11, after taking a walk, Grate told L.S. he had a bag of clothes to give her. L.S. also wanted to show him specific Bible passages. They went to the house on Covert Court where Grate was staying, and he showed her the clothes. L.S. sat on the bed and started showing him Bible passages. Grate then pulled the Bible out of her hands and said, "[Y]ou are not going anywhere."

{¶ 15} L.S. tried to push Grate away, but he punched her in the head and face and started choking her. L.S. stopped struggling and went motionless. Grate let go of her neck and started removing her clothes.

{¶ 16} L.S. stated that she was sexually assaulted "[e]very way imaginable." Grate tied her up at least three times "in weird positions, sometimes together, sometimes to the bed." He put pills in her mouth and told her they were muscle relaxers. He forcibly committed anal, oral, and vaginal rape on her. Grate videotaped the rapes on a cell phone.

{¶ 17} On L.S.'s second night of captivity, Grate slept next to her in the first-floor bedroom after tying her hands and legs together. Around 6:00 a.m. on September 13, L.S. woke up and Grate was asleep. She loosened her bindings and scooted off the bed. She then called 9-1-1 for help. Shortly thereafter, the police arrived, entered the house, and arrested Grate.

*E. Police Search the House*

{¶ 18} Following Grate's arrest, the police searched the house. Items of clothing had been attached to a mattress and a chair in the first-floor bedroom, seemingly to serve as bindings. Three devices that police suspected Grate had used

for sexual purposes were found. The police also found S.S.'s Ohio Direction card, debit card, and car keys in the bedroom.

{¶ 19} E.G.'s naked and bound body was found under clothing and bedding in the second-floor closet. A bed in the second-floor bedroom had items of clothing attached to the bed frame that were suspected to have been used as bindings.

{¶ 20} S.S.'s partially nude body was found under a pile of trash in the basement. A ligature or binding was around her neck. Another suspected sexual device was also found in the basement.

*F. Grate Makes Multiple Confessions*

{¶ 21} Between September 13 and October 17, 2016, Grate provided multiple confessions to the police about the murders, rapes, and kidnappings.

**1. E.G.**

{¶ 22} E.G. was last seen on August 16, 2016. According to Grate, he visited L.S.'s apartment, but she did not answer the door. On his way out of the apartment complex, E.G. saw Grate and invited him to her apartment. Grate and E.G. talked and played a game of Yahtzee. Afterwards, they went to the house on Covert Court, ate barbecued chicken, and E.G. returned to her apartment. Around 11:00 p.m., E.G. called Grate and asked if he wanted to play Yahtzee and talk some more. Grate agreed. They met at the YMCA and walked to the Covert Court house.

{¶ 23} Grate said that they talked when they got to his house. E.G. mentioned that she wanted to look around the house. They went to an upstairs bedroom, where Grate strangled her. He denied having sex with her. Grate removed all of E.G.'s clothing after killing her, and "hogtied" her "just in case * * * she did wake up." Grate put her body in an upstairs closet and covered the body and the outside of the closet doorway with stuffed animals and clothing. He sealed the door frame with duct tape.

{¶ 24} Grate provided varying accounts about the circumstances surrounding the murder. During one interview, Grate stated that E.G. had "talked

about killing herself." Grate wanted to see how much E.G. really wanted to die and started strangling her. He said that "she got all serious, when [he] went to calm her down, she just lost it, and [he] panicked." Grate also stated that when he and E.G. were upstairs, E.G. took her shirt off and "she just kind of like, you know, [tried] to put moves on [him]." Grate later stated that E.G.'s shirt and bra accidentally came off while he was strangling her.

{¶ 25} During another interview, Grate said, "With [E.G.] * * * it should have never happened." He stated that while he was strangling her, E.G. said, "[F]orgive him Lord for he don't know what he does." Grate said, "[Y]ou do want to live and * * * tried to hug her." Grate said that E.G. responded, "[G]et off me, * * * you tried to hurt me." According to Grate, "she just kept going on and on and it's like Jesus, save me and it's like you're not saved." He added, "My compassion wanted to just free her from this world [and] * * * unfortunately I know she's going to go through many, many years of torment." Grate said that because "it was like way too late," he finished strangling her.

{¶ 26} In a separate interview, Grate expressed his disdain for E.G. He said, "If you ever ask [E.G.,] * * * everybody has to be sad for her." He added, "[S]he's mentioned * * * not wanting to be alive before. * * * She should have been * * * put in some institution a long time ago or something." Grate denied using any of the suspected sexual devices on any of his victims while they were alive.

{¶ 27} Grate also said that he entered E.G.'s apartment about a week after killing her. He destroyed the Yahtzee score sheet with his name on it and stole other small items.

### 2. S.S.

{¶ 28} Grate admitted raping and murdering S.S. after meeting her at the BP station. Grate stated that he offered to change her tire but she lacked the proper tools. Grate asked S.S. if she wanted to "hang out sometime," and she agreed and asked Grate "what [he] was doing that evening." After the tire was changed, they

drove to the Covert Court house, went inside, and "ended up kissing." Grate said she then "wanted to play that innocent thing, so [he] then, [he] kind of just snapped on her."

{¶ 29} Grate forced S.S. to have oral sex and videotaped it on his cell phone. S.S. attempted to spray him with mace that she had. Grate then strangled her. After killing S.S., Grate "wrapped her up," dragged her body into the basement, and covered it with trash.

{¶ 30} Grate stated that he was upset with S.S.'s interaction with Bright at the BP station. He referred to Bright as one of her "sugar daddies." Grate told the police:

> I just seen how she just played this dude about changing her tire and, you know, call me sometime and all this, do you know what I mean, because she was waiting on this guy to come and change the tire, which I wanted to change the tire with his tools and stuff when she was talking to him, do you know what I mean, it's like whatever, do you know what I mean, I'm used to that type of lie.
>
> Q: So did you feel she had already sealed her fate when you watched her be manipulative to that man?
>
> A: No, when she lied to me.
>
> * * *
>
> Q: So her fate was sealed when she lied?
>
> A: Well, she had a chance to leave, I don't know, she could have fought, she just, she, she was closer to the door than me. She had her, I don't know, [her] keys were sitting here and her mace were on her keys. I walked over here, right, she could have ran out, instead she just grabs her mace and the keys, she, she could have left and she maced me.

{¶ 31} During another interview, Grate described S.S. as "just another sneaky woman." Grate said that S.S. "told on herself about getting * * * [an] assistance check each month."

{¶ 32} Grate admitted taking $43 from S.S's purse and driving S.S.'s car after killing her.

### 3. Grate demonstrates how he strangled E.G. and S.S.

{¶ 33} During the police interviews, Grate consented to a videotaped demonstration showing how he strangled E.G. and S.S. Grate used Detective Brian Evans to show how he grabbed both women from behind and placed his hands and arms around their necks to strangle them.

### 4. L.S.

{¶ 34} Grate confessed to abducting L.S. and then orally, vaginally, and anally raping her. He stated that the restraints on the bed were for L.S. and admitted to tying her down. He admitted to taking L.S.'s keys, going to her apartment, and stealing some money. He claimed that he loved L.S. and wanted to marry her.

### *G. DNA Testing*

{¶ 35} Emily Feldenkris, a forensic scientist from the Ohio Bureau of Criminal Investigation, testified that DNA profiles from vaginal swabs obtained from L.S. provided a mixture of DNA with profiles consistent with L.S. and Grate. Her report stated that Grate's DNA identified on the swab was "rarer than 1 in 1 trillion (sperm fraction, not attributed to [L.S.])," meaning that Feldenkris "would have to test over a trillion individuals to expect to find that DNA profile."

{¶ 36} Feldenkris also testified that DNA profiles from the suspected sexual devices were consistent with Grate's DNA profile. L.S., E.G., and S.S. were excluded as contributors to the DNA on those devices.

*H. Autopsy Results*

{¶ 37} Dr. Todd Barr, the deputy medical examiner for Summit County, conducted the autopsies of E.G. and S.S. Dr. Barr testified that E.G.'s body was in "an advanced state of decomposition." He stated that E.G.'s hands had been tied behind her back, fabric was tied around her neck and ankles, and her legs had been secured behind her back. Dr. Barr opined that E.G. was asphyxiated by having pressure applied to the carotid arteries and jugular veins.

{¶ 38} Dr. Barr testified that a scarf was wrapped several times around S.S.'s neck. Dr. Barr could not determine whether S.S. had been sexually assaulted. Dr. Barr concluded that the cause of S.S.'s death was "[c]ervical compression and the mechanism [was] asphyxia."

## III. PROCEDURAL HISTORY

{¶ 39} The state charged Grate with 23 counts, including four aggravated-murder counts. In Count 1, he was charged with the aggravated murder of E.G. with prior calculation and design. In Count 2, he was charged with the aggravated murder of E.G. while committing the offense of kidnapping. In Count 7, he was charged with the aggravated murder of S.S. with prior calculation and design, and in Count 8, he was charged with the aggravated murder of S.S. while committing the offense or offenses of kidnapping, rape or aggravated robbery.

{¶ 40} Each aggravated-murder count included a death-penalty specification for a course of conduct involving multiple murders pursuant to R.C. 2929.04(A)(5). Counts 1 and 2 (E.G.) included a death-penalty specification for committing or attempting to commit kidnapping as the principal offender in the aggravated murder "or, if not the principal offender, committ[ing] the [a]ggravated [m]urder with prior calculation and design" pursuant to R.C. 2929.04(A)(7). And Counts 7 and 8 (S.S.) included a death-penalty specification for committing or attempting to commit the offense or offenses of kidnapping, rape or aggravated robbery as the principal offender in the aggravated murder, or if not the principal

offender, committing the aggravated murder with prior calculation and design pursuant to R.C. 2929.04(A)(7).

{¶ 41} In Counts 3 through 6, Grate was charged with kidnapping, gross abuse of a corpse, burglary, and tampering with evidence as to E.G. Counts 9 and 10 charged Grate with kidnapping S.S. to engage in sexual activity and kidnapping her to terrorize or inflict serious physical harm. Both counts included sexual-motivation and sexually-violent-predator specifications. Counts 11 through 14 also pertained to S.S. and charged Grate with rape, aggravated robbery, gross abuse of a corpse, and using her automobile without her authorization. Count 11 also included a sexually-violent-predator specification.

{¶ 42} In Counts 15 through 20, Grate was charged with kidnapping, rape by vaginal intercourse, rape by fellatio, rape by anal intercourse, robbery, and burglary as to L.S. The kidnapping count included sexual-motivation and sexually-violent-predator specifications. And each of the rape counts included a sexually-violent-predator specification.

{¶ 43} In Counts 21 and 22, Grate was charged with burglarizing two campers at Charles Mill Lake Park. In Count 23, he was charged with breaking and entering into the Mifflin Flea Market.

{¶ 44} Grate pleaded not guilty to all charges. On the eighth day of the trial, Grate changed his pleas to guilty as to Counts 4 through 6, Count 11 and the underlying specification, and Counts 13 through 23 and the underlying specifications. After a plea colloquy, the trial court found that Grate "knowingly, voluntarily, and intelligently waived his Constitutional Rights as to th[ose] charges and specifications." The trial court accepted Grate's pleas of guilty and stayed sentencing for those counts until the end of the trial.

{¶ 45} The trial resumed, and the jury found Grate guilty as to the remaining counts and specifications, with the exception of the sexually-violent-predator

specifications attached to Counts 9 and 10, for which Grate had elected to be tried by the bench. The trial court found Grate guilty of those specifications.

{¶ 46} The trial court found that the aggravated-murder counts for E.G.'s death—Counts 1 and 2—merged, and the state elected to proceed with Count 1, for which the jury had recommended that a sentence of death be imposed. The trial court likewise found that the aggravated-murder counts for S.S.'s death—Counts 7 and 8—merged, and the state elected to proceed with Count 7, for which the jury also recommended that a sentence of death be imposed. The trial court agreed with the jury's sentencing recommendations for Counts 1 and 7 and sentenced Grate to death. As to the noncapital offenses, the trial court sentenced Grate to an aggregate prison term of 90 years to life, with the 90 years being a mandatory minimum term.

{¶ 47} Grate appeals his convictions and sentence and raises 12 propositions of law. We will address each issue in the approximate order that they arose during trial.

### IV. ISSUES ON APPEAL

#### A. Failure to Request Change of Venue

{¶ 48} In proposition of law No. I, Grate argues that defense counsel were ineffective for failing to request a change of venue.

{¶ 49} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 50} Trial courts have a duty to protect criminal defendants from inherently prejudicial publicity that renders a jury's deliberations unfair. *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Even so, pretrial publicity—even pervasive, adverse publicity—"does not inevitably lead to

an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). "[T]he best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality" is "a careful and searching voir dire." *State v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976), *vacated on other grounds*, *Bayless v. Ohio*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978). Any decision to change venue rests largely within the discretion of the trial court. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 402.

{¶ 51} Defense counsel did not request a change of venue at any point during Grate's trial. The trial court called more than 400 prospective jurors and asked them to complete a detailed questionnaire. Voir dire then proceeded in two stages. First, the trial court and counsel questioned jurors about their exposure to pretrial publicity. Second, the jurors who had not yet been excused were individually questioned about their views on the death penalty and any further pretrial publicity to which they may have been exposed.

{¶ 52} After the trial court and counsel identified 48 qualified prospective jurors during individual voir dire, the trial court asked counsel, "Is there any need to continue this process tomorrow?" The parties indicated that there was no need to continue. Thereafter, 12 jurors and 5 alternates were empaneled.

{¶ 53} Most of those seated jurors had heard or read something about the facts of the case. But each seated juror affirmed that he or she could set that information aside and decide the case solely on the evidence presented in court.

{¶ 54} It is possible that counsel made a reasonable, strategic decision to conduct the trial in Ashland County. *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 401; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 234. It is not necessary for us to decide that question, however, because Grate cannot establish that he was prejudiced as a result of the trial occurring in Ashland County.

{¶ 55} As a general rule, a "defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 29, *clarified on other grounds*, *State v. Downour*, 126 Ohio St.3d 508, 2010-Ohio-4503, 935 N.E.2d 828. However, in "certain rare cases," pretrial publicity can be so damaging that prejudice may be conclusively presumed even without a showing of actual bias. *State v. Mammone* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 56. To prevail on a claim of presumed prejudice, the defendant must make " ' "a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act." ' " (Ellipsis added in *Mammone*.) *Id.*, quoting *State v. Warner*, 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting *State v. Herring*, 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus.

{¶ 56} Grate argues that Ashland County is a smaller community, where prospective jurors might feel closer to the victims and more likely to vote for a death sentence. And he argues that pretrial publicity was so extensive in Ashland County that prejudice should be presumed.

{¶ 57} But the record includes no evidence of the amount or quality of pretrial media or social-media coverage of the case. Grate is essentially asking this court to presume that the coverage was extensive and prejudicial to him. That is insufficient to meet Grate's burden to establish prejudice under the deferential standard set forth in *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 116.

{¶ 58} Grate also argues that four specific seated jurors—juror Nos. 3, 6, 23, and 52—were actually biased against him. Grate cannot establish actual bias simply by pointing out that those jurors acknowledged that they had been exposed to some degree of media coverage. *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 71. A juror will be considered unbiased " 'if the juror

can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Id.*, quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

{¶ 59} Juror Nos. 3 and 52 both recounted exposure to some media coverage involving Grate. On her questionnaire, juror No. 3 stated that she understood that Grate "brought women back to where he was staying and offered a place to stay or drugs, and once they were there he trapped them and killed them." Juror No. 52 stated that he had read in the newspaper that Grate "confessed to something, and it [was his] understanding it was not related to this specific trial today, and so naturally, [he] thought if [Grate] confessed to something, he's guilty, must be guilty." But both jurors assured the court that they could set aside what they had heard and decide the case based on the evidence presented in court. The trial court was in the best position to judge each juror's demeanor and ability to be fair and decide whether to credit the juror's assurance that he or she would set aside any prior knowledge and preconceived notions of guilt. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 64.

{¶ 60} Grate objects to juror Nos. 23 and 6 because they each recognized one of Grate's victims. Juror No. 23 told the court during the trial that she had seen L.S. at the Kroc Center, although she had "not spoken to [L.S.] or had any interaction with her." And juror No. 6 wrote a letter to the court on the third day of trial stating that she recognized S.S. and that she had seen a newspaper headline about Grate asking someone for a date. Under questioning, juror No. 6 clarified that the meeting with S.S. was a chance encounter 10 years earlier. Juror No. 6 added that her daughter-in-law had texted her the headline and she "immediately deleted it." Both jurors assured the court that they could remain fair and impartial despite these brief and inconsequential encounters with the victims. Under these circumstances, defense counsel were neither deficient for failing to ask juror No. 23 more questions nor ineffective for not moving to excuse juror No. 6 for cause.

**{¶ 61}** Grate also argues that counsel were ineffective for failing to challenge the trial court's decision not to sequester the jury throughout the trial. The decision to sequester a jury lies within the sound discretion of the trial court. *Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 41. Here, the trial court routinely admonished the jury not to discuss the case or read any news accounts about the matter. *See generally State v. Maurer*, 15 Ohio St.3d 239, 252-253, 473 N.E.2d 768 (1984). Under these circumstances, defense counsel could have reasonably concluded that it was unnecessary to request jury sequestration during the entire trial.

**{¶ 62}** We reject proposition of law No. I.

*B. Joint Motion for Gag Order*

**{¶ 63}** In proposition of law No. II, Grate argues that defense counsel were ineffective in filing a joint motion with the state for a gag order on the parties at the same time that the trial court allowed multiple media outlets pretrial access to the court.

**{¶ 64}** Defense counsel and the state filed a joint motion requesting that the trial court

> (1) enter a gag order prohibiting the parties and their counsel from any further communication with the press regarding the merits or allegations of this case and (2) command the Ashland County Sheriff to prohibit [Grate] from communicating, in any fashion, with any member of the public or news media regarding the pending case. Based upon the joint nature of this motion, the parties hereby waive oral hearing.

In an accompanying memorandum of law, the parties stated that "[n]ews reports indicate that [Grate], while incarcerated in the Ashland County Jail, has been

writing letters to news media outlets discussing the alleged crimes and providing information and viewpoints that may potentially affect the jury pool and may potentially discuss or disclose inadmissible evidence." The trial court granted the motion and issued the gag order.

**{¶ 65}** "[T]rial courts have a wide discretion in being able to protect the judicial process from influences that pose a danger to effective justice." *Journal Publishing Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir.1986). This includes the authority to issue gag orders. Orders imposing restrictions on attorneys, parties, and witnesses are entitled to considerably more deference than a prior restraint on the press. *In re T.R.*, 52 Ohio St.3d 6, 21, 556 N.E.2d 439 (1990) (recognizing that gag orders imposed upon parties and their counsel are "considered a less restrictive alternative to restrictions imposed directly on the media"); *see also In re Contempt of Scaldini*, 8th Dist. Cuyahoga No. 90889, 2008-Ohio-6154, ¶ 12.

**{¶ 66}** Grate argues that defense counsel were ineffective in requesting the gag order because the order prevented counsel from shielding the jury pool from negative information. On the contrary, a primary purpose of the order was to shield the jury pool by limiting both parties from disclosing information about the case to the media. Moreover, as argued by the state in its merit brief, under Prof.Cond.R. 3.6, attorneys are prohibited from extrajudicial public commentary that "will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *See* Prof.Cond.R. 3.6, Comment 3. The gag order simply reinforced this ethical requirement.

**{¶ 67}** Further, Grate complains that counsel were ineffective by waiving an oral hearing on the motion for a gag order. But a hearing was unnecessary, since the state and defense agreed that a gag order was appropriate.

**{¶ 68}** Grate also complains that defense counsel made no attempt to limit media access. But he fails to explain how defense counsel could have successfully prevented media access. Because prior restraints on speech and publication may

infringe on First Amendment rights, justification for prior restraint of the media must be shown by "(a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger." *Nebraska Press Assn.*, 427 U.S. at 562, 96 S.Ct. 2791, 49 L.Ed.2d 683. Grate fails to provide any basis under this standard to support his argument that the trial court could have limited media coverage here without violating the public's First Amendment right of access to Grate's trial. *See generally Globe Newspaper Co. v. Norfolk Cty. Superior Court*, 457 U.S. 596, 603-606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Press-Enterprise Co. v. Riverside Cty. Superior Court*, 478 U.S. 1, 14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986).

{¶ 69} Finally, Grate fails to show how the gag order is related to his ineffective-assistance-of-counsel claim regarding counsel's failure to request a change of venue. Grate's ineffective-assistance-of-counsel claims about the gag order are speculative and lack merit.

{¶ 70} Based on the foregoing, we reject proposition of law No. II.

*C. Withdrawal of Not-Guilty-by-Reason-of-Insanity Plea*

{¶ 71} In proposition of law No. IX, Grate argues that defense counsel were ineffective for withdrawing his plea of not guilty by reason of insanity ("NGRI") outside his presence and when evidence supported that plea. Grate also argues that the withdrawal of his plea in his absence was plain error.

**1. Relevant background**

{¶ 72} On December 27, 2016, defense counsel filed a written plea of NGRI, in accordance with Crim.R. 11(A).[1] Counsel also asked the trial court to appoint an examiner to evaluate Grate's competency to stand trial and his mental condition at the time of the offenses.

---

1. Crim.R. 11(A) provides: "A plea of not guilty by reason of insanity shall be made in writing by either the defendant or defendant's attorney."

{¶ 73} Dr. Brian P. O'Reilly, a clinical psychologist, evaluated Grate. On February 20, 2017, Dr. O'Reilly opined that Grate was not experiencing a severe mental defect when he committed the crimes with which he was charged. Dr. O'Reilly noted that Grate said he understood his actions were wrong and illegal.

{¶ 74} The defense hired Dr. John Fabian, a clinical psychologist, to examine Grate for competency and to evaluate him for purposes of an NGRI plea. After evaluating Grate, Dr. Fabian informed defense counsel that he did not believe Grate qualified for an insanity defense.

{¶ 75} At a video hearing on April 7, 2017, defense counsel informed the court that they would be submitting Grate's signed statement in which he was withdrawing his NGRI plea. Grate was not present at that hearing. According to a sheriff's deputy, Grate had "refused to come out of his cell. He said it's just a competency hearing, he does not need to be here. His attorney can take care of it." One of Grate's defense attorneys stated that he was comfortable proceeding in Grate's absence, adding:

> I was over to have a conference with the Defendant, Shawn Grate, on Monday, April the 3rd. He has signed, along with Rolf and myself, a motion statement that we are withdrawing the plea of not guilty by reason of insanity. I explained that to him. He was able to read it and he also executed that form.

### 2. Analysis

{¶ 76} R.C. 2901.01(A)(14) provides the definition of legal insanity. A person is not guilty by reason of insanity only if the person proves that "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." *Id*. NGRI is an affirmative defense that a defendant must prove by a preponderance of the

evidence. *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 70 (10th Dist.). The proper standard for determining whether a defendant has successfully demonstrated this defense and thus is entitled to an NGRI instruction is whether he has introduced sufficient evidence, which if believed, would raise a question in the mind of a reasonable person concerning the existence of the issue. *Id.*

{¶ 77} Grate argues that defense counsel were obligated to pursue an NGRI plea because it was a viable defense and the "only possible verdict to pursue." Grate contends that his multiple confessions and cooperation with investigators, his demonstrations showing how he strangled the victims, and his lack of concern when the trial court advised him of the minimum sentence that could result from his guilty pleas showed that he feared no punishment and failed to understand the criminal nature of his conduct. He also cites L.S.'s testimony that Grate told her that he had "directions from God" and "God [was] leading" his actions.

{¶ 78} Grate fails to mention that Drs. O'Reilly and Fabian determined that he was not insane. Dr. O'Reilly explained that Grate's behavior was the product of normal criminal motives, not a major mental illness. Dr. O'Reilly said that Grate understood that his behavior was wrong and illegal.

{¶ 79} Defense counsel could reasonably have decided to withdraw the NGRI plea based on expert findings that Grate was not insane. *See State v. Purcell*, 107 Ohio App.3d 501, 506, 669 N.E.2d 60 (1st Dist.1995) (counsel was not ineffective in failing to pursue an NGRI defense when such a defense was not supported by expert testimony); *State v. Anaya*, 191 Ohio App.3d 602, 2010-Ohio-6045, 947 N.E.2d 212, ¶ 34 (6th Dist.) (when circumstances indicated that entering an NGRI plea would be unsuccessful, counsel's decision not to enter that plea is not unreasonable). The record contains a comprehensive evaluation finding Grate legally sane and does not contain evidence that at the time of the offenses, Grate was suffering from a severe mental disease or defect that prevented him from

knowing the wrongfulness of his acts. Having reviewed Dr. O'Reilly's report and having obtained Grate's permission, it was not unreasonable for defense counsel to withdraw Grate's NGRI plea. *See State v. Coleman*, 2d Dist. Montgomery No. 24955, 2014-Ohio-856, ¶ 37-38.

{¶ 80} Grate also argues that defense counsel failed to request a continuance so that Dr. Fabian would have had time to complete his mental-health examination on Grate. He contends that if Dr. Fabian had been allowed more time to complete Grate's mental-health evaluation, Dr. Fabian might have made a psychiatric diagnosis supporting an NGRI plea. This argument is speculative. Based on the information available to him, Dr. Fabian did not believe that Grate qualified for an NGRI plea.

{¶ 81} Although Dr. Fabian did request further interpretation of results from a magnetic-resonance imaging ("MRI") test that had been conducted, he did not connect that additional analysis to a possible NGRI plea and he said that additional imaging would not likely change his diagnosis. Grate has not shown that additional neuroimaging would have supported his NGRI plea.

{¶ 82} This ineffective-assistance-of-counsel claim lacks merit.

### 3. Grate's absence at the hearing

{¶ 83} A defendant has a fundamental right to be present at all critical stages of his criminal trial. Article I, Section 10, Ohio Constitution; Crim.R. 43(A). A defendant's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis added.) *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 139.

{¶ 84} Grate argues that defense counsel were ineffective by withdrawing the NGRI plea in his absence. He contends that Crim.R. 43 required his in-court presence unless he had waived this right in writing or on the record.

{¶ 85} Crim.R. 43(A)(1) provides, "In all prosecutions, the defendant's voluntary absence after the trial has commenced in the defendant's presence shall not prevent continuing the trial to and including the verdict." Grate voluntarily made himself absent from the hearing by refusing to leave his cell and attend the video hearing. *See State v. Logan*, 10th Dist. Franklin No. 87AP-633, 1988 WL 41132, *4 (Apr. 28, 1988) (defendant's refusal to leave his cell and attend his trial and sentencing hearing constituted disruptive behavior that allowed the trial to proceed in his absence). Moreover, defense counsel had permission to waive Grate's right to be present at this stage of the trial. *See Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 143 (counsel permitted to waive defendant's presence during certain portions of the trial).

{¶ 86} We hold that defense counsel were not ineffective by withdrawing Grate's NGRI plea in his absence. We reject proposition of law No. IX.

### D. Failure to Obtain Additional Neuroimaging

{¶ 87} In proposition of law No. III, Grate argues that defense counsel were ineffective for failing to request a continuance to conduct additional neuroimaging after Dr. Fabian requested that information to complete his mitigation report.

### 1. Relevant background information

{¶ 88} Before trial, defense counsel asked Dr. Douglas Scharre, an Ohio State University ("OSU") neurologist, to conduct neurological testing on Grate for mitigation purposes. The trial court authorized an expenditure of $10,000 for that testing, and an MRI was conducted. Afterwards, Dr. Scharre informed defense counsel that he lacked the training and experience needed to interpret the diffuse-tensor-imaging ("DTI") and functional-MRI-neuroimaging ("fMRI") results from

the MRI. Dr. Fabian informed defense counsel that a company called Mindset Consulting Group could conduct and interpret the DTI and fMRI neuroimaging.

{¶ 89} At an April 20, 2018 hearing, defense counsel requested approval for up to $14,500 for Mindset to conduct and interpret the DTI and fMRI testing, citing Dr. Fabian's statement that it might provide evidence of a neurocognitive disorder. When requesting the testing, Dr. Fabian noted that although the testing might give him more insight into Grate's psychological condition, it would not necessarily change his diagnoses. He also acknowledged that this is "more of your space age standard of the art, obviously expensive, neuroimaging."

{¶ 90} During the hearing, the trial court referred to an e-mail from Mindset stating that it would need to conduct a preliminary analysis of data on Grate. Using the e-mail from Mindset as a point of reference, Dr. Fabian informed the court that it would take at least a week or two to conduct the preliminary analysis and another week to process the data and draft a report. The trial court granted defense counsel's request for the additional funds.

{¶ 91} On April 30, 2018, defense counsel informed the court that the preliminary analysis had not been completed because OSU Medical Center would not let Mindset use its MRI machine. Mindset represented that it could do the preliminary analysis using the MRI machine at Cleveland Clinic. However, Grate would have to be transported to Cleveland so that he could be scanned on that machine. Defense counsel stated that Grate could undergo an MRI at the Cleveland Clinic within 24 hours.

{¶ 92} Before authorizing additional funding, the trial court ordered a video hearing "to determine whether the testing and analysis proposed by Mindset * * * meets the necessary reliability standards of *Daubert* and Evid.R. 702." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (under Fed.R.Evid. 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable");

*see also Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 24-26. Mindset stated that it would need $3,000 to prepare for a *Daubert* hearing and an additional $2,000 in witness fees. The trial court authorized "the expenditure of up to $2,000" for a qualified representative of Mindset to testify about "the scientific reliability and veracity of Mindset's * * * proposed testing and analysis" at the hearing.

{¶ 93} At the *Daubert* hearing, defense counsel informed the court that a Mindset representative would not appear because its fee could not be paid. Defense counsel presented no other evidence at the hearing. Because defense counsel had not established that Mindset's testing was scientifically reliable, the trial court excluded from evidence any information provided by Mindset.

{¶ 94} On May 10, 2018, Dr. Fabian completed a 79-page forensic-psychological evaluation on Grate. Dr. Fabian noted that he had informed defense counsel that he believed the case was moving too quickly and that defense counsel needed more time to connect with Grate's family members. He also noted that he had requested a continuance and that neuroimaging data could provide relevant and helpful evidence for the jury to consider at mitigation.

{¶ 95} During Grate's mitigation hearing, Dr. Fabian testified on Grate's behalf, but his written report was not submitted. Defense counsel asked Dr. Fabian if he had any concerns about mitigation with regard to Grate. The prosecutor objected stating, "If I am correct, he's about to discuss his request to Defense Counsel for a continuance, et cetera, that he put in the report regarding a lack of time to properly investigate." The trial court sustained the objection, telling defense counsel, "If he needed more time, you should have been asking for more time * * *. I am not going to allow evidence that he could not do the job that he was hired to do." Thereafter, defense counsel asked the following series of questions:

Q: Dr. Fabian, are you aware of neuroimaging data that was done in this case?

A. Yes.

Q: And have the findings of the neuroimaging data been discussed with you?

A: The initial findings of—I would say half of the imaging, but the rest of the imaging, no.

Q: And why did that not happen?

Mr. Tunnell:  Objection.

The Court:  Sustained.

Defense counsel presented neither Dr. Scharre's testimony nor the MRI results during mitigation.

### 2. Analysis

{¶ 96} Grate argues that defense counsel were ineffective by failing to request a continuance because Dr. Fabian stated that only "half" of the MRI imaging had been finished and that he would need additional time to incorporate the findings from further testing into his final report.  Grate also contends that a continuance was needed so that Mindset could conduct DTI and fMRI testing to support Dr. Fabian's possible diagnoses.

{¶ 97} As we discussed earlier, the trial court exercises a gatekeeping function in the admissibility of scientific evidence.  *See Daubert*, 509 U.S. at 589-590, 113 S.Ct. 2786, 125 L.Ed.2d 469; *Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, at ¶ 24-26.  Grate did not present any additional evidence supporting the reliability of the proposed tests at the *Daubert* hearing.  *See id*. at 589.  Accordingly, the trial court's ruling that any testimony about DTI and fMRI imaging would not be admissible did not constitute an abuse of discretion.  *See Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9

(trial court's decision on admissibility of expert testimony not disturbed absent an abuse of discretion).

{¶ 98} As for the ineffective-assistance-of-counsel claim, defense counsel failed to present testimony about DTI and fMRI imaging because Mindset's experts did not appear at the hearing. But their nonappearance was not defense counsel's fault. And once the trial court ruled that testimony about DTI and fMRI imaging would not be admissible, it was reasonable for defense counsel to forgo requesting a continuance.

{¶ 99} Grate argues that a defense motion for a continuance was necessary to ensure that Dr. Fabian was a competent, well-prepared expert when he testified during the mitigation phase. The record belies this claim. Dr. Fabian provided lengthy testimony explaining that Grate suffered from complex trauma and personality disorders rooted in his "childhood dysfunction." Dr. Fabian also testified, "I thought there may be some evidence of a mild Neuro Cognizance Disorder due to early childhood concussions," and he believed that Grate's "brain [was] not working right."

{¶ 100} Grate also complains about defense counsel's refusal to request a separate mental-health evaluation as part of a presentence investigation. R.C. 2929.03(D)(1) provides that "[a] presentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division *shall be furnished* to the court, to the trial jury if the defendant was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division." (Emphasis added.) Thus, counsel could have reasonably decided not to request a presentence investigation, since it would have exposed the jury to derogatory information, including Grate's criminal record.

{¶ 101} In his reply brief, Grate contends that defense counsel's "muddled" and "confused" presentation of mitigating evidence violates the principles set out in the American Bar Association ("ABA") standards. Standard 4-4.1(c) provides:

"Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter, consequences of the criminal proceedings, and potential dispositions and penalties." *ABA Criminal Justice Standards for the Defense Function* 4-4.1(c), 23 (4th Ed.2015), https://mow.fd.org/sites/mow.fd.org/files/training/2018_CLE/mit/ABA%20criminal%20justice%20standards%20for%20defense.pdf (accessed Oct. 6, 2020) [https://perma.cc/XC2T-RHUU]. Defense counsel did not violate this standard. Defense counsel requested that the trial court approve DTI and fMRI imaging, and the court denied that request after an expert witness from Mindset failed to appear for the *Daubert* hearing. *See* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 102} Even assuming that counsel's performance was deficient, Grate has not demonstrated that the outcome of the mitigation hearing would be different but for any of these alleged errors. In view of all the evidence, it is improbable that a continuance, additional neuroimaging, or a better presentation of the mitigating evidence would have changed his sentence. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 219.

{¶ 103} We reject proposition of law No. III.

### E. Failure to Argue Merger

{¶ 104} In proposition of law No. V, Grate argues that defense counsel were ineffective for failing to argue that the kidnapping and rape offenses involving L.S. should have merged for sentencing purposes and that the kidnapping and rape offenses involving S.S. should have merged for sentencing purposes.[2] He also contends that insufficient evidence exists to sustain a conviction for Count 15 (kidnapping of L.S.) and that his conviction for that count is against the manifest

2. Grate also seems to argue that Count 3, which pertained to the kidnapping of E.G., should have merged with the "corresponding rape conviction." But Grate had never been charged with raping E.G.

weight of the evidence. Grate also argues that the trial court committed plain error by accepting his guilty plea for that offense.

**1. Relevant facts**

{¶ 105} Prior to sentencing, the trial court merged Count 9 (kidnapping of S.S. for the purpose to engage in sexual activity with her) with Count 10 (kidnapping of S.S. for the purpose to terrorize or inflict serious physical harm to her). The trial court held that Count 9 did not merge with Count 11 (rape of S.S.). The trial court also held that Count 15 (kidnapping of L.S.) did not merge with Count 16 (rape of L.S. by vaginal intercourse), Count 17 (rape of L.S. by fellatio) or Count 18 (rape of L.S. by anal intercourse). Defense counsel declined to make any argument as to the merger of the kidnapping and rape offenses. In holding that the kidnapping and rape offenses did not merge, the trial court found that the offenses were committed with a separate animus because "the rapes occurred over a significant period of time where the individual was otherwise being held without rape occurring, and kidnapping is a separate offense apart from the rape."

**2. Analysis**

{¶ 106} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, we held that if a defendant's conduct supports multiple offenses, the defendant may be convicted of all the offenses if any one of the following is true: "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id*. at paragraph three of the syllabus.

{¶ 107} In *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979), we provided guidelines for determining whether kidnapping and another offense are allied offenses that should merge prior to sentencing: When "the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus to sustain separate convictions." *Id*. at syllabus. But when "the restraint is prolonged, the confinement is secretive, or the movement is

substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.* Similarly, when "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.*

{¶ 108} Although *Logan* predates *Ruff*, the *Logan* guidelines are still relevant to determining whether rape and kidnapping convictions merge. *See State v. Hackett*, 7th Dist. Mahoning No. 17 MA 0106, 2019-Ohio-3726, ¶ 30; *State v. Armengau*, 2017-Ohio-4452, 93 N.E.3d 284, ¶ 125 (10th Dist.); *State v. Asadi-Ousley*, 2017-Ohio-7252, 102 N.E.3d 52, ¶ 47 (8th Dist.).

### a. Kidnapping and rape of L.S.

{¶ 109} Grate argues that defense counsel should have sought merger of the kidnapping and rape offenses of L.S. because "she voluntarily walked" into the house in which Grate was staying and because "all of the rapes, assaults, sexual assault, and other crimes occurred in the bedroom" and no asportation occurred.

{¶ 110} Grate lured L.S. to the Covert Court house by telling her that he had clothing to give her and then raped her shortly thereafter. In doing so, he kidnapped L.S. by an act of deception, which was significantly independent from the asportation incidental to the rapes. *See State v. Ware*, 63 Ohio St.2d 84, 87, 406 N.E.2d 1112 (1980). Grate also raped, sexually assaulted, and tied L.S. to his bed and chair over a two-day period. L.S.'s restraint was prolonged, secretive, and involved extreme restraints. Thus, a separate animus existed for L.S.'s kidnapping and each rape that subsequently occurred. *See State v. D.E.M.*, 10th Dist. Franklin No. 15AP-589, 2016-Ohio-5638, ¶ 145-146. Accordingly, defense counsel were not deficient under *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, by failing to argue merger of these offenses.

**{¶ 111}** To the extent Grate also argues that his conviction for kidnapping L.S. was not supported by sufficient evidence or that his conviction was against the manifest weight of the evidence, his argument fails because he pleaded guilty to this offense. A guilty plea "waives [a defendant's] right to present manifest-weight-of-the-evidence or sufficiency-of-the-evidence attacks against his convictions." *State v. Dalton*, 2d Dist. Montgomery No. 24953, 2012-Ohio-3386, ¶ 7, citing *State v. Griggs*, 103 Ohio St.3d 85, 2004-Ohio-4415, 814 N.E.2d 51. Moreover, no plain error occurred. As we discussed above, Grate admitted to luring L.S. to the Covert Court house, which was an act of asportation by deception. *See Ware*, 63 Ohio St.2d at 87, 406 N.E.2d 1112. We reject this claim.

### b. Kidnapping and rape of S.S.

**{¶ 112}** Grate also contends that defense counsel should have asked the trial court to merge the kidnapping and rape offenses against S.S., but he presents no argument to support that claim.

**{¶ 113}** Grate invited S.S. to the Covert Court house after helping to change her tire. While at the house, Grate forced S.S. to have oral sex and videotaped it. S.S. attempted to escape by spraying mace in Grate's face, but Grate stopped her. After that, Grate killed her. Grate stated that they were at his house for about an hour and a half before he raped and killed her.

**{¶ 114}** These facts support a finding that Grate forced S.S. to remain at the Covert Court house for a prolonged period as he raped her and prevented her from escaping. Therefore, a separate animus existed for S.S.'s kidnapping and rape, and defense counsel were not deficient for failing to request the merger of the rape and kidnapping offenses of S.S. *See State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 69 (6th Dist.) (kidnapping was not incidental to rape when the victim was held for over an hour); *State v. Wade*, 10th Dist. Franklin No. 10AP-159, 2010-Ohio-6395, ¶ 74, *rev'd on other grounds*, *In re Cases Held for Decision in State v. Williams*, 130 Ohio St.3d 254, 2011-Ohio-5348, 957 N.E.2d 289 ("the kidnapping

was not merely incidental to the rape, which lasted five or ten minutes, but also involved prolonged restraint of 20 to 30 minutes").

{¶ 115} Based on the foregoing, we reject proposition of law No. V.

*F. Cumulative Ineffective Assistance of Counsel and Cumulative Error*

{¶ 116} In proposition of law No. IV, Grate raises various claims that defense counsel provided ineffective assistance during both phases of Grate's trial. He also argues that the cumulative errors and omissions that occurred throughout Grate's trial violated his constitutional rights.

{¶ 117} This claim repeats several ineffectiveness claims raised elsewhere, including withdrawal of the NGRI plea (proposition of law No. IX), failure to raise merger (proposition of law No. V), and failure to question or challenge juror Nos. 6, 23, and 52 (proposition of law No. I). But, as we explained above, all these ineffective-assistance-of-counsel claims lack merit. We discuss the remaining claims in the section addressing proposition of law No. IV below.

**1. Change of plea**

{¶ 118} Grate argues that trial counsel provided ineffective assistance by advising him to plead guilty to the noncapital offenses in the middle of the trial.

{¶ 119} On May 2, 2018, the eighth day of trial, defense counsel informed the court that Grate was changing his pleas from not guilty to guilty as to the noncapital charges and specifications in Counts 4 through 6, Count 11, and Counts 13 through 23. Defense counsel explained:

> The suggestion from [Grate] came up yesterday. * * * [H]e was pretty much confronted with the fact that they would be playing the videos, especially concerning [L.S.], and he indicated at that time that there is no reason that he cannot plead to a bunch of these counts and keep the videos from being exposed to the public, in deference to the family, not only [L.S.].

{¶ 120} The following colloquy ensued during the subsequent plea inquiry:

THE COURT:  Mr. Grate, did you have a discussion with your attorneys, about the timing of deciding to do this today, since a lot of these charges relate to a specific individual, is irrelevant to the other two?

MR. GRATE:  Yes, I have.

THE COURT:  And you are aware this is something that could have happened before this trial commenced, and evidence that may not be relevant to the remaining charges was produced?

MR. GRATE:  I believe that we talked about it.

THE COURT:  Okay.  And what made you decide today, at this point, after all of that evidence is in, that now you want to enter a plea to the specific charges?

MR. GRATE:  Just rubbing it in her face more than it already is.

THE COURT:  Is this a decision that you came to on your own?

MR. GRATE:  Yes.

THE COURT:  And then you advised your attorneys, at this point, you wanted to enter pleas to these charges?

MR. GRATE:  Yes, Your Honor.

THE COURT:  They did not solicit that position from you?

MR. GRATE:  No.

THE COURT:  Okay.  And that is a decision that you came to voluntarily?

MR. GRATE:  Yes.

(Capitalization sic.)

{¶ 121} A defendant has the ultimate authority to decide whether to plead guilty. *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). A defendant who claims ineffective assistance related to his decision to plead guilty must show that there is a reasonable probability that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 89, citing *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

{¶ 122} The record contradicts Grate's claim that defense counsel advised him to plead guilty in the middle of his trial.  The plea inquiry shows that Grate wanted to change his plea from not guilty to guilty to preclude the introduction of a cell-phone video showing him raping L.S. and to avoid "rubbing it in her face more than it already is."  Grate assured the court that his plea was voluntary.

{¶ 123} Grate also contends that defense counsel blamed him during a sidebar discussion for the decision to plead guilty during the middle of the trial. But, as the record shows, defense counsel merely informed the court that Grate was changing his plea and explained the timing of that decision.  Further, Grate fails to show how he could have been prejudiced by defense counsel's sidebar discussion, which occurred outside the hearing of the jurors.  Accordingly, this ineffectiveness claim lacks merit.

## 2. Failure to object to other-acts evidence

{¶ 124} Grate argues that defense counsel provided ineffective assistance for failing to object to numerous items of other-acts evidence.

{¶ 125} Evid.R. 404(A)(1) is a general prohibition on using evidence of a person's character to prove that he acted "in conformity therewith on a particular occasion."  Evid.R. 404(B) provides:

32

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 126} In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, *reconsideration granted*, 133 Ohio St.3d 1512, 2012-Ohio-6209, 979 N.E.2d 1290 (court of appeals ordered to address remaining assignments of error), we established a three-step analysis for determining the admissibility of other-acts evidence. The trial court must consider (1) whether the other-acts evidence is relevant in accordance with Evid.R. 401, i.e., whether it makes "any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence," (2) whether the evidence is presented to prove the character of the accused in order to show conduct in conformity therewith or whether the other-acts evidence is presented for a legitimate other purpose, such as those stated in Evid.R. 404(B), and (3) whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice as set forth in Evid.R. 403.

{¶ 127} Before the trial began, the prosecutor notified defense counsel and the court that it might introduce evidence of other crimes, wrongs, or acts. Defense counsel did not oppose the state's notice or object to any of the other-acts evidence when it was introduced at trial.

### a. Theft of a safe

{¶ 128} Detective Kim Mager from the Ashland Police Department testified that the police found a basket with a screwdriver and a bent hammer inside the house on Covert Court. She testified that these items were significant because

they corroborated Grate's statements during his interview with Mager. According to Mager, Grate told her that he had stolen a safe and attempted to pry it open with a screwdriver and a hammer. Grate also told her that the hammer "was bent as a result of him trying to get inside of the safe."

{¶ 129} In its brief, the state does not specifically address the admissibility of statements about Grate's theft of the safe. Rather, the state argues that "[i]n the context of the principal charges, Grate's admissions to low-level criminal behavior were *de minimus*," adding that such evidence was intended to "maintain the context and flow of Grate's statements to police without additional redactions over brief and fleeting statements about low-level criminal-behavior."

{¶ 130} None of the testimony about Grate's theft of the safe has any bearing on the charged offenses or satisfies the requirements for admissibility under Evid.R. 404(B). Thus, defense counsel were deficient for failing to object to this irrelevant testimony.

### b. Tubes for "love roses" used for drugs

{¶ 131} Mager testified that police found glass tubes, each of which held an individual rose, in Grate's bedroom and S.S.'s car. Mager testified that these tubes are called "love roses, and they are for dope, and you can see the tubes holding the roses inside of the box."

{¶ 132} In its notice of other-acts evidence, the state argued that the "love roses" were admissible because Grate got them from Eagle Gas Station (which had closed), they were found in his bedroom and in S.S.'s car, and he had planned to burn down the house on Covert Court and move into the closed Eagle Gas Station. The state claimed that the evidence demonstrated Grate's identity because it connected him to multiple crime scenes and demonstrated his plan and preparation to take up residence in the gas station.

{¶ 133} The proponent of the other-acts evidence must do more than simply point to a permissible purpose and assert that the evidence is relevant to it. *State v.*

*Hartman*, __ Ohio St.3d __, 2020-Ohio-4440, __ N.E.3d __, ¶ 23. Crim.R. 404(B) is concerned with the chain of reasoning that links the evidence to the purpose for which it is offered. *Id.* Here, nothing connects the drug-related evidence with the charged offenses. And the state's speculation about Grate's purpose in possessing the "love roses" is not supported by the evidence. *See State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 154. Thus, defense counsel were deficient by failing to object to that evidence.

### c. Phone calls to marijuana dealer

{¶ 134} The state also introduced statements that Grate made to police in which he admitted that he had called a marijuana "middle man" at some point during the offenses. During an interrogation, Mager asked Grate about three "either texts or calls * * * to one guy" and asked, "[I]s that anything that I need to worry about?" Grate replied that it was "[p]robably a weed guy" who was "just the middle man."

{¶ 135} In its notice of other-acts evidence, the state said that after Grate broke into L.S.'s apartment and stole money, he spent it at a Circle K convenience store and called his marijuana dealer to "further dispose of her money." The state averred that these calls demonstrate proof of motive, intent, preparation, plan, knowledge, and the absence of mistake.

{¶ 136} Admission of other-acts evidence requires substantial proof that the defendant committed those acts. *Hartman* at ¶ 28, citing *State v. Carter*, 26 Ohio St.2d 79, 83, 269 N.E.2d 115 (1971). Beyond the fact that Grate contacted "a weed guy," the state presented no evidence linking the stolen money from L.S.'s apartment with the purchase of marijuana. Indeed, the evidence showed that after Grate broke into L.S.'s apartment, he went to the Circle K and purchased cigarettes and food. The state fails to link the phone calls in question to a motive for robbing L.S. Defense counsel were also deficient by failing to object to Grate's statements about calling "a weed guy."

### d. Lack of prejudice

{¶ 137} Grate has identified several instances in which defense counsel should have objected to other-acts evidence. But defense counsel's deficient performance did not result in prejudice that deprived Grate of a fair trial considering the other overwhelming evidence of his guilt, including his confessions, L.S.'s testimony, the videos of S.S.'s rape, and his apprehension at the crime scene. *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 41.

### e. Failure to object to additional other-acts evidence

{¶ 138} Grate also argues that defense counsel failed to object to other-acts evidence that he (1) broke into an abandoned warehouse, (2) broke into the house at Covert Court, and (3) stole property from a donation box.

{¶ 139} Grate told investigators that he spent three nights in an abandoned warehouse before breaking into the house on Covert Court. Grate admitted to stealing clothes and stuffed animals from donation boxes while he was living at the Covert Court house. Some of these items were piled in front of the door of the room where E.G.'s body was hidden. Grate also lured L.S. to his house by telling her that he wanted to give her some of these clothes.

{¶ 140} This was proper common-plan evidence. Common-plan evidence typically involves events that are "inextricably related" to the crime charged and form the "immediate background" of that crime. *Hartman*, __ Ohio St.3d __, 2020-Ohio-4440, __ N.E.3d __, at ¶ 41; *see also State v. Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720. The other acts are either part of the "same transaction" as the crime charged or part of a "sequence of events" leading up to the crime in question. *Hartman* at ¶ 41. Such evidence plays an integral part in providing a complete picture of the alleged crime. *State v. Thompson*, 66 Ohio St.2d 496, 498, 422 N.E.2d 855 (1981).

{¶ 141} The evidence of the break-ins and thefts overlapped in time and place with the charged offenses. Such evidence was necessary to explain the

sequence of events to help the jury understand Grate's arrival at the Covert Court house and the presence of toys and women's clothing in the house. *See State v. Carter*, 8th Dist. Cuyahoga No. 90796, 2009-Ohio-226, ¶ 40-41. Grate fails to show that defense counsel were deficient by failing to object to such evidence.

### 3. Agreement to provide the prosecutor with Dr. Fabian's report

{¶ 142} Grate contends that defense counsel were ineffective for agreeing to provide the prosecutor with Dr. Fabian's supplemental report before it was even written. But Crim.R. 16(K) requires that each party provide any expert reports to the opposing party. *Id.* ("Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial"). Grate fails to explain how defense counsel were ineffective by agreeing to comply with this requirement. This ineffective-assistance-of-counsel claim lacks merit.

### 4. Waiving opening statements, failing to make a motion under Crim.R. 29, and failing to present trial-phase evidence

#### a. Waiver of opening statements

{¶ 143} Grate argues that defense counsel's waiver of trial-phase and mitigation-phase opening statements mirrors their failure to make objections and their general lack of participation during trial.

{¶ 144} Defense counsel's failure to make an opening statement is not per se ineffective assistance of counsel. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 189, citing *Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir.2002). We have recognized that "[r]eserving an opening statement at the beginning of trial has the advantage of not disclosing the defense's trial strategy before the prosecution presents its case." *Id.* And if the defense ultimately decides not to put on evidence, an opening statement is unnecessary. *Id.*, citing *Moss* at 863.

{¶ 145} Grate fails to explain how the absence of opening statements prejudiced him. The defense strategy during the trial phase was to attack perceived

weaknesses in the state's evidence. And the defense presented forceful testimony in the mitigation phase from Dr. Fabian and Barbara Charter, Grate's half-sister. Accordingly, Grate's conclusory allegations fail to support a finding that opening statements in the trial phase, the mitigation phase or both would have created the reasonable probability of a different outcome in his trial. *Id.* at ¶ 191.

### b. Failure to make a Crim.R. 29 motion for acquittal

{¶ 146} Grate argues that defense counsel were ineffective because they did not make a motion pursuant to Crim.R. 29 for acquittal at the end of the state's case. A motion for acquittal may be granted only when, construing the evidence most strongly in favor of the state, the evidence is insufficient to sustain a conviction. *State v. Scott*, 6th Dist. Sandusky No. S-02-026, 2003-Ohio-2797, ¶ 20; *see also* Crim.R. 29. Counsel's failure to make a Crim.R. 29 motion for acquittal is not ineffective assistance when such a motion would have been futile. *See Scott* at ¶ 20; *Thomas v. United States*, 951 F.2d 902, 905 (8th Cir.1991). Here, the state presented overwhelming evidence linking Grate to the crimes charged. Defense counsel were not deficient by failing to make a Crim.R. 29 motion when such a motion would have been futile.

### c. Failure to present trial-phase evidence

{¶ 147} Grate argues that defense counsel were ineffective by failing to introduce any trial-phase evidence. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.3d 749 (2001). Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy*, 91 Ohio St.3d 516, 542, 747 N.E.2d 765 (2001), quoting *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993). Although the defense did not introduce any trial-phase evidence, Grate fails to state what evidence defense counsel should have introduced during the trial

phase or how that evidence would have made any difference in the outcome of the case. This ineffective-assistance-of-counsel claim lacks merit.

### 5. Failure to cross-examine witnesses

{¶ 148} Grate argues that defense counsel were ineffective for failing to cross-examine the majority of the state's witnesses. "Trial counsel need not cross-examine every witness * * *. The strategic decision not to cross-examine witnesses is firmly committed to the trial counsel's judgment * * *." *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996). The record does not show that counsel's decision was unreasonable. Many of the witnesses that were not cross-examined testified about facts that were not in dispute. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 272.

{¶ 149} Further, with one exception, Grate does not explain what information counsel failed to elicit during cross-examination. Grate complains that "[a]t one point during [Detective Mager's] direct examination, [she] implied that Grate's belief he would marry [L.S.] suggested a disconnect from reality." But defense counsel could have reasonably concluded that further questioning about Grate's feelings for L.S. would serve no useful purpose. Grate also fails to explain how he was prejudiced by defense counsel's failure to cross-examine Mager further.

### 6. Failure to object to the prosecutor's improper mitigation-phase argument

{¶ 150} Grate argues that defense counsel were ineffective for failing to object to the prosecutor's mitigation-phase argument that there were four aggravating circumstances. Although the prosecutor made a misstatement, the trial court informed the prosecutor of his misstatement. The prosecutor then correctly told the jury that there are "two counts and two specifications of each count." Under these circumstances, Grate suffered no prejudice from defense counsel's failure to make a timely objection.

**7. Failure to question alternate juror and lack of legal knowledge of *Hurst v. Florida***

{¶ 151} Grate argues that defense counsel were ineffective by agreeing to replace juror No. 94 with alternate juror No. 131 without first questioning juror No. 131. But defense counsel had questioned juror No. 131 during voir dire and did not challenge that juror for cause. Grate fails to explain how questioning juror No. 131 further would have benefited him. We have "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998). Thus, this claim lacks merit.

{¶ 152} Grate also contends that defense counsel lacked knowledge of *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). In *Hurst*, the United States Supreme Court held that Florida's capital-sentencing scheme violated the Sixth Amendment because it allowed a judge, rather than a jury, to make the findings necessary to impose the death penalty. *Id*. at 98-99. But in *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, ¶ 42-43, we held that Ohio's death-penalty scheme is different from Florida's former scheme and does not violate the Sixth Amendment. Grate has not pointed to evidence in the record showing that defense counsel lacked knowledge of *Hurst*. But even if counsel lacked knowledge of *Hurst*, that fact alone fails to support an ineffective-assistance-of-counsel claim. This claim is also rejected.

**8. Presenting inadequate mitigating evidence**

{¶ 153} Grate argues that defense counsel were ineffective for presenting only two witnesses during mitigation.

{¶ 154} "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record,

mental and emotional stability, and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). Failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing may constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Grate has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 104.

{¶ 155} Grate complains that defense counsel called only Dr. Fabian and Barbara Charter, his half-sister, as mitigation witnesses. Dr. Fabian provided lengthy testimony explaining that Grate suffered from complex trauma and personality disorders rooted in his "childhood dysfunction." Charter described Grate's upbringing, chaotic childhood, and lack of a loving and nurturing environment. Through this testimony, defense counsel provided the jury with substantial mitigating evidence on Grate's behalf. Moreover, the record does not show that defense counsel failed to investigate the possibility of presenting additional mitigating evidence. *See Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 286.

{¶ 156} Therefore, Grate has not shown that his counsel performed deficiently in the presentation of evidence during the mitigation phase.

### 9. Not properly responding to objections

{¶ 157} Grate argues that defense counsel failed to adequately respond to prosecutorial hearsay objections made during Dr. Fabian's and Charter's testimony. He argues that defense counsel should have invoked Evid.R. 101(C)(3) in response to the state's objections to some of Charter's testimony. That rule provides that the Ohio Rules of Evidence do not apply to sentencing proceedings, but it does not exclude application of those rules to mitigation proceedings.

**{¶ 158}** R.C. 2929.04(C) gives defendants great latitude in presenting evidence during the mitigation phase of a capital trial. Yet the Rules of Evidence, including the hearsay rules, still apply to mitigation-phase hearings. *See State v. Williams*, 73 Ohio St.3d 153, 159, 652 N.E.2d 721 (1995); *State v. Jalowiec*, 91 Ohio St.3d 220, 233, 744 N.E.2d 163 (2001); *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 128.

**{¶ 159}** Charter testified that their mother had been sexually abused and that the home that they had been living in caught on fire. Although the trial court excluded the testimony because Charter lacked first-hand knowledge of the information, Grate's counsel argued that the testimony was admissible. Accordingly, Grate cannot show that defense counsel were deficient. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 212.

**{¶ 160}** Grate also complains that his counsel failed to respond adequately when the prosecutor objected to Charter's testimony that Jim Crates, the mitigation specialist, had difficulty contacting Grate's family members. But the trial court allowed the question after defense counsel rephrased it. Thus, counsel were not ineffective because the information was presented.

**{¶ 161}** Grate argues that defense counsel "sat mute" and failed to object when the prosecutor cross-examined Dr. Fabian about an appellate opinion that criticized his performance in another capital case. At the trial court's prompting, though, Grate's counsel objected to the line of questioning. And trial court sustained the objection. Grate fails to show that he was prejudiced by counsel's lapse.

**{¶ 162}** Finally, Grate argues that defense counsel failed to object to a limiting instruction from the trial court informing the jurors that "any statements made to Dr. Fabian by other individuals is hearsay. They are not evidence in this case." But again, Grate's counsel argued that the testimony was admissible.

Therefore, Grate cannot show that defense counsel were deficient. *See Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 212.

### 10. Ineffective trial-phase closing argument

{¶ 163} Grate challenges several aspects of his counsel's trial-phase closing argument. He first argues that his counsel's closing argument was overly brief. We reject this claim because counsel are afforded wide latitude during closing arguments. The length of a closing argument ordinarily involves questions of discretion and strategy. "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 192.

{¶ 164} Grate also contends that defense counsel were ineffective for asserting during closing argument that the murders were not aggravated. Defense counsel argued that Grate did not commit aggravated murder during a kidnapping because E.G. and S.S. went to the Covert Court house on their own volition. Counsel also argued that Grate did not murder S.S. during a robbery because she was robbed after the murder. Given the overwhelming evidence of Grate's guilt, even if counsel's performance was deficient, Grate cannot show that he was prejudiced. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 61.

{¶ 165} Next, Grate asserts that defense counsel made an absurd argument, suggesting that some of the sexual conduct was consensual. Defense counsel argued that Grate and S.S. "supposedly kissed and made out and there was no evidence as a real plan to dispose of a body or flee the scene." But this was part of a defense argument that Grate was not guilty of committing the aggravated murder of S.S. by prior calculation and design. Grate cannot show that he was prejudiced by such argument.

{¶ 166} Finally, Grate contends that defense counsel were deficient in characterizing him as a "[s]tand-up guy" who

admitted the strangulation when he was wrong, and was an honest person in the interview, and co-counsel and myself and [Grate] know fully well that [Grate] will not walk out of this courtroom a free man, and we ask for a fair and impartial verdict based on the law and the evidence that you and each of you determine it to be.

Counsel's characterization of Grate coupled with the candid acknowledgement of his responsibility appears to have been aimed at building rapport with the jury. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 225. Defense counsel's argument does not reflect deficient performance.

### 11. Ineffective mitigation-phase closing argument

{¶ 167} Grate maintains that defense counsel presented an ineffective closing argument during mitigation.

{¶ 168} He argues that defense counsel were ineffective in arguing that Grate could have killed the victims in a more violent manner. Defense counsel stated that each victim died of strangulation, adding that "[t]here was no wound * * * by firearm or bladed weapon or as a club-type weapon." But Grate fails to show how this matter-of-fact recitation of the victims' cause of death prejudiced him.

{¶ 169} Grate also objects to defense counsel's emphasis on his multiple confessions and cooperation with police. But evidence that a defendant confessed and cooperated with the authorities is a proper mitigating factor. *See, e.g.*, *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 166.

{¶ 170} Next, Grate complains that defense counsel were ineffective because they blamed S.S. for her own death by arguing that Grate "snapped on her because he thought that she was talking like a goodie-goodie girl and he saw her as a slut, and applied the cervical compression to her." Counsel then asked the jury,

"Are those what you consider to be [acts] of a normal human being?" It is questionable whether defense counsel's graphic characterization of Grate's motivation for killing S.S. was appropriate or helpful. Nonetheless, defense counsel's remarks focused on highlighting a mitigating feature of Grate's actions— e.g., mental imbalance. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 231. This argument was a tactical decision and did not constitute ineffective assistance. *See id.*

{¶ 171} Grate also argues that defense counsel improperly asked the jurors, "Why would you not keep or store those bodies like you would trophies from some big time African safari hunt?" This comment was inappropriate and unhelpful. In view of overwhelming evidence that the aggravating circumstances outweighed the mitigating factors, though, Grate cannot show that the comment resulted in prejudice that deprived him of a fair trial. *See Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, at ¶ 41.

### 12. Failure to prepare a sworn or unsworn statement during mitigation

{¶ 172} Grate argues that defense counsel were ineffective by failing to prepare him to make a sworn or unsworn statement during mitigation.

{¶ 173} Grate, "*not counsel*, had the choice whether to testify or give an unsworn statement." (Emphasis added.) *State v. Brooks*, 75 Ohio St.3d 148, 157, 661 N.E.2d 1030 (1996). And regardless, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury." *Id.*

{¶ 174} The record does not show what defense counsel told Grate or recommended about making a sworn or unsworn statement. Moreover, Grate does not explain what information he could have provided that might have made a difference in the outcome of his trial. Thus, Grate has not demonstrated that counsel were ineffective in failing to prepare him to make a statement during mitigation. Accordingly, we also reject this claim.

### 13. Cumulative error

**{¶ 175}** Grate argues that cumulative errors and omissions violated his constitutional rights. Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223.

**{¶ 176}** As we explained above, defense counsel were deficient at several points in Grate's trial. But none of these errors rose to the level of reversible error. Errors "cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996). Grate also fails to explain how the cumulative effect of defense counsel's errors deprived him of a fair trial. In view of the overwhelming evidence of Grate's guilt, we conclude that the cumulative effect of counsel's errors did not deprive him of a fair trial. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 322.

**{¶ 177}** Based on the foregoing, we reject proposition of law No. IV.

*G. Hearsay Objections and Charter's Mitigation Testimony*

**{¶ 178}** In proposition of law No. VI, Grate recasts some of his ineffective-assistance-of-counsel claims from proposition of law No. IV as a complaint that the trial court improperly sustained hearsay objections to (1) Charter's testimony that Crates, the mitigation specialist, had difficulty contacting Grate's family members and (2) Charter's testimony about their mother's history of being sexually abused. Grate again argues that "it is improper for a trial court to use Ohio's Rules of Evidence to exclude mitigation evidence in the [mitigation] phase of a death penalty trial." But as we explained above, the Rules of Evidence, including the hearsay rules, apply to mitigation-phase hearings. *See Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 128; *Jalowiec*, 91 Ohio St.3d at 233, 744 N.E.2d 163.

{¶ 179} The United States Supreme Court has carved out an exception to evidentiary rules during mitigation-phase hearings in extreme circumstances when the exclusion of certain evidence would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *State v. Sheppard*, 84 Ohio St.3d 230, 237-238, 703 N.E.2d 286 (1998).

{¶ 180} In *Green*, the trial court excluded, as hearsay, testimony during the mitigation phase that a codefendant had confided to killing the victim and that Green had not participated in the murder. The Supreme Court reversed the trial court's judgment, holding that the evidence was highly relevant to one of the mitigating factors. *Id*. at 97.

{¶ 181} Charter's testimony does not compare to the evidence that had been excluded in *Green*. First, after defense counsel rephrased the question, Charter was allowed to testify that Crates had difficulty getting other family members to talk to him. Second, Charter's excluded testimony about their mother's childhood sexual abuse was largely cumulative to Dr. Fabian's testimony about Grate's family's history. Dr. Fabian later testified that Grate's mother "got married * * * at age 14 * * * [and] she escaped *a lot of her own abuse*." (Emphasis added.)

{¶ 182} Finally, even if any of this mitigation-phase testimony was improperly excluded, our independent review of the record regarding Grate's death sentence cures that error. *See State v. Sanders*, 92 Ohio St.3d 245, 267, 750 N.E.2d 90 (2001) (a trial court's error excluding proffered testimony during a mitigation phase is cured during this court's independent review of a death sentence).

{¶ 183} We reject proposition of law No. VI.

*H. Dr. Fabian's Testimony as Substantive Evidence*

{¶ 184} In proposition of law No. VII, Grate argues that the trial court erred by not allowing Dr. Fabian to testify that other family members thought his mother

was "mean" and by instructing the jury that any statement that had been made to Dr. Fabian by other individuals was based on hearsay.

{¶ 185} Dr. Fabian testified about Grate's relationship with his mother. He stated that Grate was afraid of his mother while he was growing up and always described her as "miserable." Dr. Fabian stated that Grate's fear of his mother and his belief that she was always miserable was a "focal point of at least [Dr. Fabian's] evaluation with [Grate], and maybe [an] explanation as to these offenses." Defense counsel asked Dr. Fabian these follow-up questions:

Q: And did the information that you obtained from Shawn, was that corroborated or consistent with getting information from other people?

A: Yes, I would say so.

Q: Okay.

A: Especially from folks that I talked to like aunts or cousins, or a sister about the mother just being mean, cold—

{¶ 186} Following this testimony, the prosecutor asked for "a limiting instruction on hearsay, other than [Grates]." Over defense counsel's objection, the trial court instructed the jurors that "any statements made to Dr. Fabian by other individuals [was] hearsay," not evidence, and could be considered only to the extent that it had been used by Dr. Fabian to support his professional opinion. Again, Grate's argument is predicated on his belief that the Rules of Evidence do not apply to the mitigation phase of the trial. As we discussed in our analysis of propositions of law Nos. IV and VI, we reject that argument as incorrect.

{¶ 187} The admissibility of expert testimony is within the discretion of the trial court. Evid.R. 104(A). Such decisions will not be disturbed absent abuse of discretion. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616, 687 N.E.2d 735

48

(1998) (lead opinion). "Abuse of discretion" suggests unreasonableness, arbitrariness, or unconscionability. *Calderon v. Sharkey*, 70 Ohio St.2d 218, 222, 436 N.E.2d 1008 (1982). Without those elements, it is not the role of this court to substitute its judgment for that of the trial court.

{¶ 188} Evid.R. 703 governs the admissibility of expert opinions and provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." While Evid.R. 703 permits an expert to testify as to his opinion based on the facts or data perceived by him, the rule does not grant blanket admissibility to those underlying facts or data if they are not otherwise admissible under the Rules of Evidence. *Lorence v. Goeller*, 9th Dist. Lorain No. Civ.A 04CA008556, 2005-Ohio-2678, ¶ 44.

{¶ 189} Dr. Fabian's opinion of Grate's relationship with his mother was based, in part, on the hearsay accounts of other family members that Grate's mother was "mean" and "cold." These foundational facts were admissible to inform the jurors of the bases for Dr. Fabian's opinion. But the statements from Grate's other family members were not admissible as substantive evidence because they were hearsay. Thus, the trial court did not abuse its discretion in excluding this testimony. Moreover, the trial court's instructions were correct. *See State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 57 (trial courts should ensure that jurors are instructed as to the limits of an expert's testimony).

{¶ 190} We reject proposition of law No. VII.

*I. Replacement With Alternate Juror Before Mitigation*

{¶ 191} In proposition of law No. XII, Grate argues that the trial court committed a structural error when it replaced a juror with an alternate juror before the mitigation phase began without inquiry or allowing counsel an opportunity to conduct an inquiry.

{¶ 192} Before the start of the mitigation phase, juror No. 94 informed the court that he had a concert to attend and would lose "$1,000 out-of-pocket" if he was required to remain as a juror during the mitigation phase. After the court and counsel discussed different options, defense counsel moved to excuse juror No. 94. The trial court discharged juror No. 94 and substituted alternate juror No. 131 in his place. Defense counsel did not question juror No. 94 or alternate juror No. 131 before the dismissal and seating the alternate.

### 1. Structural-error analysis does not apply

{¶ 193} Grate argues that the court's decision to replace the juror after the trial phase but before the mitigation phase began constituted structural error. We disagree.

{¶ 194} A structural error is one that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural errors "permeate '[t]he entire conduct of the trial from beginning to end.' " (Brackets added in *Perry*.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17, quoting *Fulminante* at 309. Most constitutional errors are not structural. *Fulminante* at 306-307. An error is structural only when it "render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. United States*, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

{¶ 195} The Supreme Court of the United States has found an error to be structural, and thus subject to automatic reversal, in only a very limited class of cases. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (lead opinion) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122

(1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction to jury).

{¶ 196} Grate provides no legal authority in support of his structural-error argument. Crim.R. 24(G) and R.C. 2945.29 govern the removal and replacement of jurors during criminal trials. Replacing a juror with an alternate juror, as occurred here, does not invoke a structural-error analysis. *See State v. Jennings*, 2017-Ohio-8224, 100 N.E.3d 93, ¶ 9-13 (8th Dist.) (rejecting claim that replacing a juror during deliberations was structural error).

### 2. Doctrine of invited error applies

{¶ 197} The doctrine of invited error also applies to Grate's claim because defense counsel moved to replace juror No. 94. That doctrine specifies that a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co., Lincoln–Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. Thus, Grate may not complain of an error that he induced.

### 3. The trial court did not err in replacing juror No. 94 with alternate juror No. 131

{¶ 198} Even if Grate had not invited the trial court's action, he provides no legal authority to support his claim that the trial court erred in replacing juror No. 94 with alternate juror No. 131.

{¶ 199} Crim.R. 24(G)(1) provides that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are *found to be unable* or disqualified to perform their duties." (Emphasis added.) The procedure for replacing jurors with alternates is the same in capital cases. Crim.R. 24(G)(2). Crim.R. 24(G)(2) specifically

contemplates that the trial court may need to replace a seated juror with an alternate juror after the trial phase of a capital trial.

{¶ 200} The trial court has discretion to determine when a seated juror should be replaced by an alternate juror before deliberations begin. *See State v. Shields*, 15 Ohio App.3d 112, 119, 472 N.E.2d 1110 (8th Dist.1984). Moreover, Crim.R. 24(G) does not require a trial court to conduct an evidentiary hearing to corroborate a juror's unavailability before being excused. *See Jennings*, 2017-Ohio-8224, 100 N.E.3d 93, at ¶ 19.

{¶ 201} Grate also argues that an alternate juror should not be allowed to replace a sitting juror after the trial-phase verdict but before the mitigation phase has begun. As stated above, Crim.R. 24(G)(2) permits a trial court to replace a juror after the trial phase of a criminal trial. And even before Crim.R. 24 was amended to specifically permit this practice, we rejected an argument similar to the one made by Grate in *State v. Hutton*, 53 Ohio St.3d 36, 559 N.E.2d 432 (1990), paragraph three of the syllabus (former Crim.R. 24(F)—which is now Crim.R. 24(G)—was not violated when an alternate juror was substituted for another juror in a capital trial after the trial-phase verdict, but before deliberations began in the mitigation phase). Nevertheless, Grate argues that the trial court approached the issue nonchalantly and that defense counsel did not sufficiently address the issue.

{¶ 202} Grate mischaracterizes the level of involvement of both the court and his counsel. The record shows that the court and counsel discussed different options before defense counsel moved to excuse juror No. 94. And Grate fails to explain what additional questioning his counsel or the trial court could have asked before juror No. 131 replaced juror No. 94. As discussed in this opinion's rejection of Grate's proposition of law No. IV, defense counsel questioned alternate juror No. 131 during voir dire and found no reason to challenge that juror.

{¶ 203} We reject proposition of law No. XII.

*J. Consecutive Sentences*

{¶ 204} In proposition of law No. X, Grate argues that when a defendant has received a death sentence, a trial court errs by imposing consecutive sentences to "protect the public from future crime." Because Grate failed to object to the imposition of consecutive sentences at sentencing, he has forfeited this issue, absent plain error. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 152.

{¶ 205} Pursuant to R.C. 2929.14(C)(4), in order to impose consecutive sentences, the trial court must find on the record that consecutive sentences are "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." The court must also find that at least one or more of the aggravating factors in R.C. 2929.14(C)(4)(a) through (c) are present.

{¶ 206} In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37, we held that the trial court must make the requisite findings before imposing consecutive sentences "at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings."

{¶ 207} The trial court imposed consecutive sentences for Counts 1 (aggravated murder of E.G.), 7 (aggravated murder of S.S.), 9 (kidnapping of S.S.), 11 (rape of S.S.), 15 (kidnapping of L.S.), 16 (rape by vaginal intercourse of S.S.), 17 (rape by fellatio with S.S.), and 18 (rape by anal intercourse with S.S.), for a "mandatory 90 years to life, with two death sentences." There is no dispute that the trial court made the findings required by R.C. 2929.14(C)(4) at Grate's sentencing hearing and incorporated those findings into the judgment entry, including a finding that consecutive sentences were necessary to protect the public from future crime.

{¶ 208} Grate argues that in light of his death sentence, it is "nonsensical and a violation of [Ohio's] sentencing statute" for the trial court to find that consecutive sentences are necessary to protect the public from future crimes. Both claims lack merit.

{¶ 209} No Ohio sentencing statute prohibits the imposition of consecutive sentences in capital cases, and Grate fails to provide any legal basis to support his argument that a court cannot impose consecutive sentences if it also imposes the death sentence.

{¶ 210} We reject proposition of law No. X.

*K. Proportionality*

{¶ 211} In proposition of law No. VIII, Grate cites R.C. 2905.05(A) and argues that his death sentence is unconstitutional because the trial court did not evaluate it for proportionality in relation to other heinous crimes. But R.C. 2929.05(A) does not require a *trial court* to engage in a proportionality review; it requires an *appellate court* to review every death sentence for proportionality. R.C. 2929.03(F), which prescribes the requirements for a trial court's sentencing opinion in a capital case, says nothing about the trial court conducting a proportionality analysis. Instead, we review Grate's sentence for proportionality as part of our independent sentence evaluation under R.C. 2929.05(A). *See State v. Steffen*, 31 Ohio St.3d 111, 122-123, 509 N.E.2d 383 (1987).

{¶ 212} We reject proposition of law No. VIII.

*L. Violation of* Hurst v. Florida

{¶ 213} In proposition of law No. XI, Grate argues that Ohio's capital-sentencing procedures violate the right to a jury trial under the Sixth Amendment to the United States Constitution, as construed in *Hurst*, 577 U.S. 92, 136 S.Ct. 616, 193 L.Ed.2d 504. Grate acknowledges that we rejected this claim in *Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, at ¶ 42-43, but asks us to overrule *Mason*. Because Grate cites no authority in support of his request and makes no

arguments that compel us to overrule *Mason*, we decline to revisit that holding. *Id.* at ¶ 41-42.

{¶ 214} We reject proposition of law No. XI.

## V. INDEPENDENT SENTENCE EVALUATION

{¶ 215} Having considered Grate's propositions of law, we must now independently review Grate's death sentence for appropriateness and proportionality and independently determine whether the aggravating circumstances of which Grate was convicted outweigh the mitigating factors pursuant to R.C. 2929.05(A).

### A. Aggravating Circumstances

{¶ 216} Grate was convicted of two death specifications as to Count 1 (E.G.) and two death specifications as to Count 7 (S.S.). The jury found that Grate killed E.G. and S.S. as "part of a course of conduct involving the purposeful killing of * * * two or more persons," R.C. 2929.04(A)(5). The jury found that he committed E.G.'s aggravated murder while committing the offense of kidnapping, R.C. 2929.04(A)(7). And the jury found that he committed S.S.'s aggravated murder while committing the offense or offenses of kidnapping, rape or aggravated robbery, R.C. 2929.04(A)(7).

{¶ 217} The evidence at trial supports Grate's conviction under R.C. 2929.04(A)(5) and (A)(7) with respect to each of the two counts of aggravated murder. On August 16, 2016, Grate lured E.G. to where he was living on Covert Court, strangled her, and hid her body in an upstairs closet. On September 8, 2016, Grate invited S.S. to the same house, raped and strangled her, and hid her body in the basement. He also stole S.S.'s car.

{¶ 218} The discovery of the bodies in the closet and basement at the Covert Court house, Grate's apprehension at the crime scene, his multiple confessions, his cell-phone videos of S.S.'s rape, and the coroner's testimony established Grate's guilt of the death-penalty specifications for the two aggravated murders. The

murders were directly linked in time, location, and method of death. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (factors such as time, location, a common scheme, or a common psychological thread may establish the factual link necessary to prove a course-of-conduct specification).

### *B. Mitigating Factors*

{¶ 219} Against these aggravating circumstances, we must weigh the mitigating factors contained in R.C. 2929.04(B). In mitigation, Grate presented testimony from his half-sister and Dr. Fabian. Grate also made a statement in allocution before sentencing.

### 1. Barbara Charter's testimony

{¶ 220} Charter, Grate's older half-sister, provided background information about Grate's family and upbringing. Charter's parents, Teresa McFarland and Edward Meadows, were originally from Kentucky. McFarland and Meadows married when Meadows was 21 and McFarland was 14. Charter described her father as a "draft dodger" who wanted to get married and have a child to avoid being drafted and fighting in the Vietnam War. Charter was born in June 1969. They moved to Canada and then lived in Ypsilanti, Michigan. Charter stated that McFarland was an alcoholic and that Meadows physically abused McFarland. Charter's parents were divorced when she was two and a half years old. Meadows returned to Kentucky.

{¶ 221} When Charter was three years old, she and her mother settled in Marion, Ohio. McFarland worked at Baja Boats and was a dancer at a Marion bar, where she met Terry Grate, Grate's father. McFarland married Terry in 1974, and they had two sons: Jason in 1974 and Grate in 1976. Charter described McFarland's second marriage as "off and on." Grate's parents divorced "around 1980."

{¶ 222} Charter stated that McFarland was young and did not give the children a lot of attention, because "she wasn't connected to us." Charter's first recollection of Grate was an event that occurred when he was around two years old.

He squirted mustard on a brand new carpet after telling his mother that he was hungry and wanted a sandwich but she told him that he had to wait to eat.

{¶ 223} Charter stated that McFarland "would go out a lot and partied with her friends and we would not see her until Sunday night." Charter assumed responsibilities for "being the mother of the house" when she was 12 years old. Charter took care of Grate and his brother until she was about 16.

{¶ 224} Charter stated that Grate had a lot of problems in school and that he had learning disabilities. He was held back in kindergarten and first grade, and testing showed that he had dyslexia. Grate was a very good baseball player, but he broke his arm playing baseball when he was 14. A large tumor was found in his arm and part of Grate's hip was later removed to replace bone in his arm. Grate never played baseball again.

{¶ 225} Charter married when she was 17 and moved out of the house. Charter stated that "everything kind of turned to chaos after [she] moved out." When Grate was 11, McFarland moved to Kentucky with a man she later married. Grate spent the next four years living with his father. McFarland later tried to get Grate to live with her and her current husband, but Grate refused.

{¶ 226} Charter stated that she and her brothers did not live in a "loving house," and that "there was no family time, or * * * no loving, nurturing time, environment." She has not talked to McFarland for a couple of years, explaining that her personal relationship with her mother is nonexistent and toxic. Charter described McFarland's relationship with Grate as "a controlling relationship. Who was going to control who, that is how [she] had always seen it. * * * [A]nd it was a battle in the household, and that was apparent at a young age between the two of them."

{¶ 227} During cross-examination, Charter stated that she had not seen Grate since 2004 and had lost contact with Jason in 2005.

### 2. Dr. Fabian's testimony

{¶ 228} Dr. Fabian characterized Grate's upbringing as "a quite tumultuous, chaotic family life, [that was] dysfunctional." Grate's mother "escaped a lot of her own abuse, got married at a young age, [and was] pregnant at a young age."

{¶ 229} Grate had an "unstable childhood." Grate lived with his mother for nine years before she moved to Kentucky without him. Grate and his brother lived with his father for a few years. Grate reunited with his mother for a period of time when she returned to the area. Dr. Fabian stated that Grate's mother was a bartender and a "Go-Go Dancer."

{¶ 230} According to Dr. Fabian, Grate called his mother "crazy and mentally ill." Grate said there was a lack of consistency with her, stating that she would bring men into their home "to find the guy that was going to be a meal ticket." Grate reported "early fantasies of wanting to kill his mother." He was always afraid of his mother and called her "miserable." Grate thought she "lived a life of misery and [he] wanted to take her out of that misery." Dr. Fabian added:

> Even developmentally as a kid, he had fantasies or thoughts of doing that. So it seems that there was a love and hate split towards his mother, and [he] had a desire to want to be with her, but also a rejection and a hatred towards her.
>
> So that would be a focal point of at least my evaluation with him, and maybe explanation as to these offenses.

Dr. Fabian stated that the "miserable theme" appeared to link Grate's feelings for his mother with E.G.'s murder. He stated that Grate wanted to "take his mother out of her own misery, and I think in some way, shape or form, that theme is carried out in some of his offenses."

{¶ 231} Dr. Fabian stated that "there was a lot of trauma and destruction in [Grate's] relationships with women," which "carries over from his early lack of connection with his mom." According to Dr. Fabian, Grate's romantic relationships also seemed dysfunctional. "Some of them had domestic violence, they were destructive in nature." Grate showed "a lack of intimacy or ability to form proper physical, sexual, [and] emotional attachments with women."

{¶ 232} Dr. Fabian diagnosed Grate with a persistent mild depressive disorder, which is a long-term condition. Grate has learning disabilities, which often leads to low self-esteem in children. Indeed, Dr. Fabian learned from Grate's family that "he had low self-esteem as a youth and was kind of a depressed kid." Grate had also been diagnosed with unspecified bipolar and related disorders and attention-deficit/hyperactivity disorder ("ADHD"). Dr. Fabian stated that there was "evidence of complex trauma, which is significant trauma that has a foundation interpersonally between a child and a parent, where there is either abuse or neglect." He opined that Grate had suffered from "neglect and emotional detachment" rather than physical or sexual abuse.

{¶ 233} Grate was also diagnosed with a language-based learning disorder, which is a neurodevelopmental disorder involving a flawed or compromised brain function. Dr. Fabian stated that Grate was "reading and functioning academically somewhere around 10 or 11 years of age, and he did not have that good of skill set, academically."

{¶ 234} Dr. Fabian stated that Grate has "a full scale IQ of 83, and that is in the below average to borderline range of intelligence." Further testing showed a score of 76 for verbal comprehension, which is in the "5th percentile"; a score of 100 on perceptual spatial reasoning, which is average; a score of 80 on the "working memory area," which is in the "9th percentile"; and a score of 89 on "[p]rocessing speed," which is in the "25th percentile," and is considered to be in the "average range."

{¶ 235} Dr. Fabian believed that Grate has a mild "Neuro Cognizance Disorder" due to a traumatic brain injury. Grate had some early childhood concussions. This would affect "areas of executive functioning, kind of how we reason and problem solve, basically the frontal lobe of the brain." Dr. Fabian added, "I will say that [in] my opinion, his brain is not working right, basically, I think that we have an analogy of a car of four wheels, we have a three-wheeled car driving on the road."

{¶ 236} Dr. Fabian also diagnosed Grate with a cannabis-use disorder. Grate was smoking up to "a quarter ounce per week." Dr. Fabian believed that Grate used cannabis "to deal with his emotions, his depression, and even maybe his energy, his highs, and just to deal with life in a maladaptive matter."

{¶ 237} Finally, Dr. Fabian diagnosed Grate with a "personality disorder, * * * mixed and severe." He stated that Grate had the "characteristics of [an] antisocial personality." This includes having difficulty with following rules, being impulsive and reckless, and having a disregard for himself and others.

{¶ 238} Dr. Fabian stated that around the age of 20, Grate had been treated for mental illness. He was treated at the Marion General Hospital for depression and prescribed Zoloft, an antidepressant. He was also treated at an outpatient clinic in 2016 for depression.

{¶ 239} Dr. Fabian believed that Grate exhibited an attachment disorder "during these offenses." He stated: "[Grate's] mother told me that she thought that she had her own Reactive Attachment Disorder as a youth * * *. And that she never attached to anyone, and I think that carried over certainly to how she raised him, and especially him being off and on with his father, as well." Dr. Fabian further explained that Grate had an "inability to connect properly with other people" and harbored "rage and hate towards his mother." Dr. Fabian opined that Grate's rage towards his mother contributed to his criminal acts towards the victims here. Dr. Fabian also opined that Grate's need to be in control, "which he never had with his

mother," was interconnected to his actions by "taking control and putting [the victims] out of their misery that he always wanted to do with his mother. There is a theme there."

{¶ 240} During cross-examination, Dr. Fabian acknowledged that he had found no hospital records diagnosing Grate with a concussion. Dr. Fabian said, "There is evidence of self-report, family report, but not medically." He stated that Grate knew what he was doing was illegal. Grate also expressed a hope to Dr. Fabian that he would kill more people in prison.

### 3. Statement in allocution

{¶ 241} Prior to sentencing, Grate made the following statement:

All right. Well, it is * * * a good day, mainly for you all of you guys and myself, and the hopes that we can move on from all of this, I don't know exactly * * * I cannot say that I am normal. But I know right from wrong, and mainly, if I caused any hate, bitterness in any of you, I need to work on that, and ask that you maybe forgive me, and find in your heart someday, I know not today, but someday, and move on from this life and may justice be served today.

That is most important for [E.G.], [S.S.], and [L.S.].

Thank you for all of your time and this mess. I am sorry for all human beings having to hear this, okay. I am sorry, I cannot change nothing, believe me, I would, not for me but for you guys. Thank you, Your Honor.

### C. Sentence Evaluation

{¶ 242} We find nothing mitigating in the nature or the circumstances of the offenses. Grate lured E.G. to the Covert Court house, strangled her, and hid her body in an upstairs closet. A few weeks later, Grate lured S.S. to Covert Court,

where he raped and strangled her. He hid her body in the basement and stole her car. These are horrific crimes that lack any mitigating features.

{¶ 243} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant prior criminal record), (B)(6) (the offender was an accomplice and not the principal offender), and (B)(7) (any other relevant factors).

{¶ 244} The first six of these statutory factors do not apply here. We give some weight to other mitigating evidence under R.C. 2929.04(B)(7). This evidence includes Grate's confessions and cooperation with police. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 159. It also includes his drug problems. Although there is no testimony that drugs reduced his ability to control his actions at the time of the murders, Grate told Dr. Fabian that he was smoking up to "a quarter ounce" of cannabis every week. *See Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 278.

{¶ 245} We give considerable weight to Grate's mental-health problems under R.C. 2929.04(B)(7). Grate's I.Q. of 83 falls within the below-average to borderline range of intelligence. He has also been diagnosed with a long-term mild depressive condition, a bipolar and related disorders, ADHD, a language-based learning disorder, a neuro cognizance disorder, and a personality disorder. *See Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, at ¶ 296; *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 300.

{¶ 246} In addition, we give weight to Grate's chaotic background and upbringing under R.C. 2929.04(B)(7). Charter's testimony shows that Grate was raised in a dysfunctional household, in which emotional abuse was prevalent. Dr. Fabian's evaluation disclosed that Grate had a particularly difficult relationship with his mother, who was often away from home on weekends and who brought different men home frequently. *See Kirkland* at ¶ 157. But we have seldom given

decisive weight to this factor. *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265.

{¶ 247} Dr. Fabian linked Grate's feelings of misery toward his mother, and his fantasy of murdering her, with similar feelings that caused him to murder E.G. and S.S. But we find nothing that is mitigating in this connection. And Grate acknowledged during allocution that he knew right from wrong when he strangled E.G. and S.S.

{¶ 248} Upon independent weighing, we conclude that the aggravating circumstances as to each aggravated-murder count clearly outweigh the mitigating factors beyond a reasonable doubt. With respect to E.G.'s murder, the convictions on the specifications for course of conduct and aggravated murder during a kidnapping strongly outweigh the mitigating factors. With respect to S.S., the convictions on the specifications for course of conduct and aggravated murder during a kidnapping, rape or aggravated robbery overwhelm the mitigating factors. His mitigating evidence is weak in comparison.

{¶ 249} Finally, we must determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). We conclude that the death sentence is both appropriate and proportionate when compared to other course-of-conduct murders for which the death penalty has been imposed. *See, e.g*, *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 257, *overruled on other grounds*, *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475; *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182.

{¶ 250} We also conclude that the death sentence is both appropriate and proportionate when compared to other kidnapping-murder cases, *see, e.g.*, *Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, at ¶ 169, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 334, and *Trimble* at ¶ 331;

rape-murder cases, *see, e.g.*, *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 266, *State v. Cooey*, 46 Ohio St.3d 20, 42, 544 N.E.2d 895 (1989), and *State v. Benner*, 40 Ohio St.3d 301, 319-320, 533 N.E.2d 701 (1988); and robbery-murder cases, *see, e.g.*, *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 278, *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 270, and *Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 168.

## VI. CONCLUSION

{¶ 251} We find no reversible error in the proceedings below.  We affirm the convictions and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., concurs, with an opinion.

_____

**DONNELLY, J., concurring.**

{¶ 252} I concur in the court's opinion and judgment affirming appellant Shawn Grate's aggravated-murder convictions and death sentences.  I agree that the overwhelming evidence of Grate's guilt negates any possibility of prejudice in an ineffective-assistance-of-counsel claim stemming from the trial phase of the lower-court proceedings.  I am less confident that Grate was not prejudiced by his counsel's deficient performance in the mitigation phase.

{¶ 253} The alleged instances of counsel being ineffective in this case are very concerning.  The failings by Grate's defense counsel were more than plentiful; some were so blatant that they inspired the trial judge to intervene to prompt counsel to lodge the most basic of objections.  But the ineffective-assistance-of-counsel claims that I find to be particularly significant are related to counsel's

failure to present adequate psychiatric and neurological evidence in the mitigation phase of Grate's capital proceedings.

{¶ 254} During the mitigation phase of capital proceedings, the focus is on the defendant as an individual and on the circumstances surrounding the offenses rather than on the proof of his guilt. *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Gregg v. Georgia*, 428 U.S. 153, 197, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Unlike the yes-or-no process of determining a capital defendant's guilt, the process of determining whether to impose the ultimate penalty of death requires the jury to weigh any aggravating factors against any mitigating factors. *Gregg* at 193. Even with overwhelming proof supporting the existence of any aggravating factors, a single mitigating factor could potentially tip the scales against a jury's decision to impose the death penalty. *See Eddings v. Oklahoma*, 455 U.S. 104, 116-117, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Roberts v. Louisiana*, 431 U.S. 633, 637, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). Accordingly, it is imperative that a jury be able to consider all relevant evidence in support of any mitigating factor. *See Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion); *Eddings* at 112. .

{¶ 255} Defense counsel failed to ensure the timely analysis of Grate's neuroimaging results and failed to ensure that the expert was able to finish Grate's mitigation report, leaving the jury with an incomplete view of Grate's mental health. Counsel's failure to provide the jury with Grate's potential mental-health diagnoses could be particularly problematic given that mental-health diagnoses are "entitled to significant weight in mitigation." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 132. However, speculation is not evidence and there is not enough information in the record before this court to conclude whether Grate has satisfied the prejudice prong of the ineffective-assistance-of-counsel analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Information outside the record is necessary to determine

whether counsel's failure to present particular evidence had a prejudicial impact on the outcome of Grate's mitigation phase of his capital proceedings. *See State v. Cooperrider*, 4 Ohio St.3d 226, 228, 448 N.E.2d 452 (1983). If such evidence exists, it would be entirely appropriate to submit it in a postconviction petition as support for an ineffective-assistance-of-counsel claim. *See*, *e.g.*, *Porter v. McCollum*, 558 U.S. 30, 31, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (evidence that was not presented during the mitigation phase of a defendant's capital trial raised the reasonable probability that the defendant's sentence would have been different had the sentencing judge and jury heard the significant mitigation evidence that defendant's counsel neither uncovered nor presented).

{¶ 256} If there is any information outside the record to support an argument that Grate was prejudiced by defense counsel's deficient performance, I would certainly hope that such information would be brought to the appropriate court's attention in a postconviction petition.

_____

Christopher R. Tunnell, Ashland County Prosecuting Attorney; and Dave Yost, Attorney General, and Stephan E. Maher and Brenda S. Leikala, Senior Assistant Attorneys General, for appellee.

Donald Hicks and Donald Gallick, for appellant.

_____