[Cite as *State v. Williams*, 2023-Ohio-3625.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                        No. 112148

    v.                            :

ADRIAN WILLIAMS,                        :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 5, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-659036-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Amanda Bizub, Assistant Prosecuting Attorney, *for appellee*.

Friedman Nemecek & Long L.L.C., Eric C. Nemecek, and Mary K. Walsh, *for appellant*.

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Adrian Williams ("Williams") appeals from his convictions for rape and kidnapping. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} This case stems from events that occurred on May 20, 2013. The victim, C.R., testified at trial in November 2022 to the following events as she recalled them. At the time of the May 2013 incident, 15-year-old C.R. was living near East 55th Street and Broadway Avenue in Cleveland, Ohio, and regularly attending an after-school program at Esperanza, a nonprofit organization located at West 25th Street and Clark Avenue in Cleveland.

{¶ 3} When C.R. was walking home from Esperanza[1] on the evening of May 20, 2013, she was approached by two black men in a pickup truck. C.R. declined their offer of a ride. The truck began to drive away and then turned around, drove back to C.R., and both men got out of the truck. C.R. testified that the older of the two men approached her, punched her in the face, knocking her out. Both men then put her in the truck. The men stopped at a gas station near Steelyard Commons, where one man stayed in the vehicle and the other man got fuel. The men then took C.R. to a nearby apartment. C.R. testified that she did not remember how they got to the apartment and was in and out of consciousness on the way there. She described standing in the living room of the apartment, nervous and crying, and testified that the men offered her alcohol. C.R. initially declined alcohol, but

---

[1] C.R. testified that the incident began when she was walking home from Esperanza after school. A police report indicates that earlier in the day on May 20, 2013, C.R. was involved in a domestic dispute at home and had fled the house, going to the Clark-Fulton area (near Esperanza). C.R.'s family reported the domestic dispute to the police and reported C.R. as a missing juvenile; C.R. was subsequently arrested. In her trial testimony, C.R. acknowledged the domestic dispute but seemingly confused the timeline of events.

eventually accepted alcohol from the men. The men then took C.R. to a bedroom, where she claimed she was tied to a bed and orally and vaginally raped.

{¶ 4} C.R. testified that two days later, when the men had left C.R. in the apartment, she used her feet to get a pocketknife from a nightstand and was eventually able to cut herself free. C.R. tried to leave the apartment but found that it was locked from the outside. Ultimately, C.R. jumped out of what she testified was a "second floor or third floor" window. C.R. testified that she scraped her knees and was limping afterwards but was otherwise uninjured from jumping out of the window.

{¶ 5} C.R. quickly realized that she was not far from where she had been kidnapped, so she decided to go to Esperanza, which was closer to her location than her house. At Esperanza, C.R. encountered a security guard, William Wilson ("Wilson"), who she knew and trusted. Wilson told her not to call the police immediately and drove her home when his shift ended.

{¶ 6} Wilson testified at trial that he knew C.R. well because he had been working at Esperanza since 2011 and saw her and her siblings on a regular basis. Wilson testified that on May 22, 2013, C.R. hurried into the building in the middle of the day. Wilson testified that C.R.'s demeanor was unusual, and she told him that someone had grabbed her. Wilson then went to speak to two female staff members about what had happened and came back downstairs, where C.R. asked him if he would take her home. After getting permission from his supervisor, Wilson drove C.R. home. When asked why he did not call the police, or instruct C.R. to call the

police, Wilson stated that C.R. "didn't really tell me anything wrong at the time and I figured when she got home she would explain that to her parents."

{¶ 7} At trial, C.R. testified that she did not know either man, but at some point she heard one of the men referred to as "Dre." In the police report and sexual assault nurse examiner ("SANE") report, C.R. stated that the men called each other "Adrian" and "Drew."

{¶ 8} A SANE nurse, Molly Heinrich ("Heinrich"), examined C.R. and collected a rape kit containing buccal, vaginal, and anal swabs from C.R. C.R. was also treated by Dr. Jerri Rose ("Dr. Rose"), an attending physician, and interviewed by a social worker. Dr. Rose testified at trial. The following exchange took place during Dr. Rose's direct examination:

> ASSISTANT PROSECUTING ATTORNEY ("APA"): Do you guys note, outside of injuries, emotional appearance?
>
> DR. ROSE: We do sometimes in the general examination, we might make a note of a patient's general appearance, which could include emotional affect.
>
> APA: Here did you — did your resident note an emotional affect?
>
> DR. ROSE: The resident documented that the patient had what she documented as a flat affect.
>
> APA: Okay. And can you explain to the jury what a flat affect means in a medical term?
>
> DR. ROSE: You know, in lay terms it would just mean that the patient's demeanor was just very flat, not very emotional, kind of detached, might be a term that you would use as a synonym.
>
> APA: In the [emergency department], you see a lot of people who have gone through different types of trauma, is this something that you usually see after trauma?

DR. ROSE: It's something that we can commonly see. Often it's difficult to know if the patient has had any sleep, and if they're rested after a traumatic event. It is absolutely not uncommon to have patients who are just almost detached because of the trauma that they have been through.

Defense counsel objected, and after a brief sidebar, the court overruled the objection.

{¶ 9} Dr. Rose went on to testify that as a result of C.R.'s medical examinations, it was documented that she had a left eye contusion and a reported sexual assault. Dr. Rose also read from Heinrich's report, which noted that C.R.'s vaginal area had a small amount of blood and the area was very sore during the SANE examination.

{¶ 10} Cleveland Police Officer Scott Aldridge ("Aldridge") testified at trial that he was detailed to the Sex Crimes Unit in 2013. Aldridge retrieved C.R.'s rape kit from University Hospitals, checked that it was sealed, and sent it to the Third District. Subsequently, the kit was stored in the Third District property room.

{¶ 11} The case was initially assigned to Detective James Butler ("Detective Butler"). In the initial investigation, Williams's DNA was identified in the rape kit, but Detective Butler determined that Williams did not match the description of the assailant provided by C.R. Based on this conclusion, and other perceived inconsistencies,[2] the investigation was closed. Detective Butler has since passed away.

---

[2] The initial police report identifies the following discrepancies: C.R. stated she was hit in the eye but no injuries were noted; C.R. stated she was taken to an apartment building behind Target in Steelyard Commons but there is not an apartment building at

{¶ 12} Inexplicably, eight years later, in 2021, Investigator Gene Kulp ("Kulp") of the Cuyahoga County Prosecutor's Office was assigned this case by the assistant prosecuting attorney in charge of the cold case unit. Kulp testified that he reviewed the case and saw that the police had an investigative lead to Williams in 2013. Kulp testified that based on C.R.'s description of her assailant as a dark-skinned black man, approximately 5'10" and 180 pounds, with a mustache, he believed that Williams matched this description.

{¶ 13} Kulp testified that he arranged for a blind administrator to present a photo array of six men, including Williams, to C.R., and she identified Williams as her assailant. C.R. stated that she recognized Williams by his mustache and identified him as the man who had driven the pickup truck. Kulp also prepared a second photo array of six men, including Andre Bush, a relative of Williams who matched C.R.'s description of the second assailant. C.R. did not identify Bush in the second photo array. Kulp testified that as part of his investigation, he contacted C.R.'s mother, but she was unable to remember the incident because she suffers from dementia.

{¶ 14} As a result of his investigation, Kulp obtained a search warrant to collect buccal swabs from Williams. Kulp was also able to determine that in 2013, Williams owned a tan pickup truck that matched C.R.'s description of the vehicle that was registered to Williams at apartment 226 at the Crestview Apartments, 1400

---

that location; C.R. stated she jumped out of a fourth-story window to escape but did not sustain any injuries as a result; and the same day that C.R. stated she was abducted, she was arrested by Cleveland police for domestic violence.

Crestline Avenue, Cleveland, Ohio. Kulp identified this apartment building and C.R. subsequently identified photos of the apartment building as the place she had been held captive. Lisa Lindsay ("Lindsay") of the Cuyahoga Metropolitan Housing Authority testified that Williams leased a unit at Crestview Apartments on Crestline Avenue in Cleveland, Ohio. This apartment building is approximately one mile south of Steelyard Commons.

{¶ 15} At trial, C.R. confirmed that she had made the identifications of Williams and the apartment building. She also confirmed that the pocket knife the state introduced into evidence was the knife she used to escape from the apartment.

{¶ 16} Marissa Esterline ("Esterline"), a forensic DNA analyst at the Cuyahoga County Regional Forensic Science Laboratory, testified that someone in her office initially analyzed C.R.'s rape kit in 2013, and that Esterline subsequently analyzed C.R.'s rape kit in March 2021. Esterline testified that sperm found in C.R.'s rape kit matched Williams's DNA.

{¶ 17} On direct examination, C.R. testified that she was in the foster system until she turned 18. She also testified that she dropped out of high school and eventually earned her GED when she was 24 years old. C.R. testified that she gave birth to her first child when she was 18, her second child when she was 21, and her third child when she was 22. C.R. testified that her second child was murdered and after the murder, her third child was placed in the custody of C.R.'s adoptive sister. Defense counsel objected, arguing at a sidebar that this testimony was not relevant, and the assistant prosecuting attorney responded that C.R. has been through trauma

and that it has affected her memory and what she remembers. The court sustained the objection and asked defense counsel if they wanted the court to instruct the jury to disregard what happened to C.R.'s second child. Defense counsel responded that moving on would be the preferred course of action.

{¶ 18} On June 1, 2021, a Cuyahoga County Grand Jury indicted Williams on three counts of rape in violation of R.C. 2907.02(A)(2), with sexually violent predator specifications; two counts of kidnapping in violation of R.C. 2905.01(A)(4), with sexual motivation specifications and sexually violent predator specifications; and one count of kidnapping in violation of R.C. 2905.01(B)(2), with a sexual motivation specification and a sexually violent predator specification.

{¶ 19} Williams initially pleaded not guilty to the indictment. The case proceeded to a jury trial on August 9, 2022; the sexually violent predator specifications were tried to the court. Williams was found guilty of all counts and specifications.

{¶ 20} On November 3, 2022, the trial court sentenced Williams to 30 years to life.

{¶ 21} Williams filed a timely notice of appeal and presents three assignments of error for our review:

> I. The trial court erred in failing to merge Williams's offenses under R.C. 2941.25.
>
> II. State misconduct during closing argument violated the protections afforded by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 10 of the Ohio Constitution.

III. The trial court erred in permitting improper testimony which prejudiced Williams.

## Law and Analysis

### I. Merger

{¶ 22} In his first assignment of error, Williams argues that the trial court erred by failing to merge his offenses under R.C. 2941.25. Specifically, Williams argues that kidnapping and rape are allied offenses of similar import and should have been sentenced separately.

{¶ 23} R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 24} Generally, we review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25. *State v. Bailey*, Slip Opinion No. 2022-Ohio-4407, ¶ 6, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1. "Although determining whether R.C. 2941.25 has been properly applied is a legal question, it necessarily turns on an analysis of the facts, which can lead to exceedingly fine distinctions." *Id.* at ¶ 11. Specifically, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, we consider three questions: """(1) Were the offenses

dissimilar in import or significance? (2) Were they committed separately? (3) Were they committed with separate animus or motivation?"'" *Bailey* at ¶ 10, quoting *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.  If the answer to any of these questions is yes, separate convictions are permitted.  *Id.*

{¶ 25} The Ohio Supreme Court has recognized that "'implicit within every forcible rape * * * is a kidnapping' because the victim's liberty is restrained during the act of forcible rape."  *State v. Brisbon*, 8th Dist. Cuyahoga No. 105591, 2018-Ohio-2303, ¶ 39, quoting *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1975).  *Logan* provided the following guidelines for determining whether rape and kidnapping are allied offenses that should merge for sentencing:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is so substantial as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

{¶ 26} Williams argues that because the state maintained that Williams kidnapped C.R. solely for the purpose of repeatedly raping her, the kidnapping therefore did not increase the risk of harm to the accuser.  We are not persuaded by Williams's argument.

{¶ 27} As an initial matter, Williams's characterization of the state's theory of the case is undermined by our review of the record. Regardless of this mischaracterization, the record reflects that the kidnapping and rape offenses in this case were not allied offenses of similar import. The record reflects that Williams punched C.R., with enough force to knock her out and result in a contusion to her eye, in order to abduct her. Williams then drove around with C.R. for an undetermined amount of time before taking her to his apartment. At his apartment, C.R. was tied to a bed and repeatedly raped and sexually assaulted over a two-day period. These facts mirror those of *State v. Grate*, in which the Ohio Supreme Court held that a separate animus existed for kidnapping and rape where the assailant tied one of his victims to his bed and chair and repeatedly assaulted her over a two-day period. *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 110, citing *State v. Dalton*, 2d Dist. Montgomery No. 24953, 2012-Ohio-3386, ¶ 7, citing *State v. Griggs*, 103 Ohio St.3d 85, 2004-Ohio-4415, 814 N.E.2d 51.

{¶ 28} In support of his argument, Williams cites cases in which there was no increased risk of harm associated with the kidnapping apart from that of the sexual assault, and the restraint of the victim "had no significance apart from facilitating the rape." *State v. Asadi-Ousley*, 2017-Ohio-2652, 90 N.E.3d 263, ¶ 46 (8th Dist.), *State v. Mpanurwa*, 2017-Ohio-8911, 102 N.E.3d 66 (2d Dist.). Unlike those cases, C.R. sustained a physical injury as a result of the kidnapping and endured an extended period of restraint, during which she was periodically sexually assaulted. While the sexual assaults were ongoing, they took place in a fraction of

the period of time during which C.R.'s liberty was restrained. The restraint was prolonged because it took place over several days, the confinement was secretive because C.R. was placed into a private vehicle and then kept in a private apartment, and the kidnapping resulted in an increased risk of harm to C.R. Furthermore, Williams's act of moving C.R. from her location on the street to his apartment was significant and prolonged. Williams forced C.R. into his vehicle and drove her to an entirely separate location. Therefore, "the 'asportation of [C.R.] constituted a separate crime for which [Williams] may be separately punished.'" *State v. Lundy*, 8th Dist. Cuyahoga No. 105117, 2017-Ohio-9155, ¶ 30, quoting *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 40. For these reasons, the offenses were not allied offenses of similar import. Therefore, the trial court did not err in declining to merge the rape and kidnapping offenses for sentencing. Williams's first assignment of error is overruled.

## II. Closing Arguments

{¶ 29} In Williams's second assignment of error, he argues that state misconduct during closing argument violated his constitutional rights. Specifically, he argues that the assistant prosecuting attorneys expressed personal opinions as to the veracity and credibility of witnesses. Williams points to several statements, in which the state referred to C.R.'s testimony as "powerful, truthful, [and] honest," described Wilson as "very military," and referred to defense counsel's arguments as "nonsense" and "ridiculous."

{¶ 30} A prosecutor has considerable latitude during closing argument. *State v. Hunt*, 8th Dist. Cuyahoga No. 111892, 2023-Ohio-1977, ¶ 46, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149. The test for prosecutorial misconduct in closing argument is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Lee*, 2016-Ohio-8324, 75 N.E.3d 956, ¶ 36 (8th Dist.), quoting *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. *Smith* at 14. Further, prejudice is shown when there is a reasonable probability that but for the improper remark by the prosecutor, the result of the trial would have been different. *Hunt* at ¶ 46, citing *State v. Stevens*, 3d. Dist. Allen No. 1-14-58, 2016-Ohio-446, 58 N.E.3d 584, ¶ 53.

{¶ 31} The state argues that the statements in question were not improper because they did not state that the witness was "credible." We are not necessarily persuaded by the state's attempt to draw an exceedingly fine distinction between "truthful [and] honest" and "credible." Even if the statements were improper, however, there is not a reasonable probability that but for the statements, the result of the trial would have been different. The state presented significant evidence, including DNA evidence, that corroborated C.R.'s story. The inconsistencies in C.R.'s story were fully litigated at trial and highlighted repeatedly by defense counsel. The jury had the ultimate task of deciding C.R.'s credibility, and this was

emphasized by the state in its closing argument. For these reasons, we cannot say that the state of Ohio committed prosecutorial misconduct that violated Williams's constitutional rights. Therefore, his second assignment of error is overruled.

**III. Improper Testimony**

{¶ 32} In his third assignment of error, Williams argues that the trial court erred in permitting improper testimony that prejudiced Williams. He refers specifically to testimony from C.R. and Dr. Rose.

{¶ 33} With respect to C.R.'s testimony, Williams argues that the state prompted testimony from C.R. regarding her deceased child and the related trauma that was irrelevant and introduced only to elicit sympathy from the jury.

{¶ 34} A trial court has broad discretion in the admission or exclusion of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should be slow to interfere. *State v. Wagner*, 8th Dist. Cuyahoga No. 93432, 2010-Ohio-2221, ¶ 23, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032. Williams has made no argument that the trial court's admission of the aforementioned testimony from C.R. was unreasonable, arbitrary, or unconscionable so as to amount to an abuse of discretion. Our review of the record likewise reveals nothing to support a conclusion that the admission of the testimony constituted an abuse of discretion.

{¶ 35} With respect to Dr. Rose's testimony, Williams argues that Dr. Rose's testimony describing what "flat affect" meant in the context of the SANE nurse's report violated Crim.R. 16(K). Crim.R. 16(K) governs expert witnesses and reports

and provides that an expert witness "shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications."

{¶ 36} Williams's reliance on Crim.R. 16(K) is misplaced here. The testimony in question was a part of Dr. Rose's testimony as a fact witness, testifying as to both her observations and treatment of C.R. in this case and her experience with sexual assault kits in general. The trial court did not err in permitting this testimony. For these reasons, Williams's third assignment of error is overruled.

{¶ 37} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
SEAN C. GALLAGHER, J., CONCUR